735 A.2d 1039

**Joyce A. GREEN**

v.

**H & R BLOCK, INC. et al.**

**No. 125, Sept. Term, 1998.**

Court of Appeals of Maryland.

Aug. 25, 1999.

**490**

**492**

494

Steven E. Angstreich, Philadelphia, PA, Robert J. Hedge, Mobile, AL (Charles J. Piven and Marshall N. Perkins, Law Offices of Charles J. Piven, P.A., Baltimore), for appellant.

N. Louise Ellingsworth (Bryan Cave, LLP, Eric G. Zahnd, Kansas City, MO; Louis J. Ebert, Gebhardt & Smith, LLP, Baltimore), on brief, for appellees.

Argued before BELL, C.J., and ELDRIDGE, RODOWSKY, CHASANOW *, RAKER, WILNER and CATHELL, JJ.

CHASANOW, Judge.

This case involves the tax preparation and refund services provided by H & R Block to thousands of Maryland residents. The primary issue for our consideration relates to whether H & R Block may have a duty to disclose to customers the benefits it receives from lending institutions to which it refers customers who are seeking a bank loan in the amount of their anticipated tax refund. The trial court granted H & R Block's motion to dismiss, finding, *inter alia,* that H & R Block had no duty to disclose the benefits because no fiduciary obligation exists between H & R Block and its customers. For the reasons set forth below, we reverse, finding that sufficient facts have been alleged to warrant a factual determination regarding the existence of a principal-agent relationship that gives rise to a fiduciary duty to disclose any conflict of interest.

## I. Factual Background
### A.

This class action lawsuit was filed in the Circuit Court for Baltimore City on behalf of all those in Maryland for whom H & R Block prepared taxes and who participated in its "Rapid

---

* Chasanow, J., now retired, participated in the hearing and conference of this case while an active member of this Court. After being recalled pursuant to the Constitution of Maryland, Article IV, § 3A, he participated in the decision and adoption of this opinion.

Refund" program by obtaining a "Rapid Anticipation Loan" (RAL) any time from January 1992 to present. The named plaintiff, Joyce A. Green, the appellant in this appeal, used H & R Block's tax preparation and filing services in 1993, 1994, and 1995. Because we are reviewing the trial court's dismissal of Green's complaint, we will assume the truth of the facts alleged in the complaint. *See* Part II, *infra.*

H & R Block's tax filing services allow customers to obtain faster tax refunds than would otherwise occur by simply mailing the return to the Internal Revenue Service (IRS). H & R Block offers two such services. A customer can pay $25 for H & R Block to file the return electronically, enabling the customer to obtain the refund in two weeks. For customers who want to obtain an even faster refund, H & R Block arranges bank loans in the amount of the customer's refund through its RAL program. H & R Block's RAL program lies at the center of this dispute, and so we describe it in detail.

Through its RAL program, H & R Block facilitates loans between its customers and a third-party bank that are secured by the taxpayer's anticipated refund. In Maryland, H & R Block arranges the loans through Beneficial National Bank (BNB). H & R Block informs the taxpayer of his or her eligibility for the loan after preparing a customer's return and learning that the taxpayer is entitled to a refund payment from the IRS. Interested customers then fill out a loan application. A paragraph on the reverse side of the loan application explains:

"Upon approval of your rapid Refund Anticipation Loan by Beneficial National Bank an account is opened in your name at Beneficial National Bank. This account is established to receive the Direct Deposit of your Federal Tax Refund from the IRS. When you endorse the Refund Anticipation Loan check you have authorized Beneficial National Bank to withdraw the amount deposited into this account by the IRS and apply this amount to your Refund Anticipation Loan balance. If your IRS refund is greater than your RAL, a check in such excess amount will be sent to you shortly after the bank receives your refund."

H & R Block transmits the loan application to the bank for the customer. H & R Block then files the refund electronically with the IRS, and the IRS is informed to send the customer's tax refund check directly to the bank. The customer picks up the loan check at H & R Block's offices within a day or two after filing. The service allows customers to obtain the amount of their refund in a loan within a few days rather than waiting approximately two weeks for the IRS to send the actual refunds that are electronically filed.

The cost of an RAL is described in the loan materials as a "finance charge" of BNB. For the tax years 1993–95, when Green used the RAL program, the finance charges ranged from $29 to $89. The finance charge is deducted directly from the taxpayer's refund by the bank. The annual percentage rate of interest that corresponds to the finance charge ranged from approximately 25% to 500%, depending on the amount of the refund and the amount of the finance charge to the particular customer.[1]

The loan application, entitled "A Refund Anticipation Loan Program Offered by Beneficial National Bank in Association with H & R Block," authorizes H & R Block to disclose to the bank the customer's federal income tax return "for the purpose of enabling BNB to determine whether or not to make a Refund Anticipation Loan ("RAL") to me in response to my application for such loan which is a part of this form." As a result of H & R Block's and the bank's screening of potential RAL customers, customers who for one reason or another may not receive their IRS refund are deemed ineligible for the RAL program. Because of this screening process, and because the IRS deposits the tax refunds directly into the customers' account at the lending bank which may then with-

---

1. The record shows that Joyce A. Green, the class representative, paid a $29 finance charge for the RAL service in 1993. For her 1994 and 1995 filings, however, the spaces in Green's loan applications where the amount of the finance charge is to be inserted were left blank. The reverse sides of the 1994 and 1995 loan application forms include disclosures for sample finance charges of $29, $34, and $89.

draw the proceeds to pay the loan, lenders take on few risks by lending money to the taxpayer.

The 1993 application requires the H & R Block customer to sign an "acknowledgment," stating:

"By signing below, I acknowledge that the FINANCE CHARGE for my RAL is $_____ and I further acknowledge that I have read and understand the important disclosures above and on the reverse side of this Loan Application form. . . ."

For each RAL that it arranges between the taxpayer and the bank, H & R Block benefits financially in at least one, and up to as many as three ways. First, for every RAL referred to a lending bank, H & R Block receives a "license fee" that is not disclosed to the H & R Block taxpayer/customer. The "license fee" is a payment by the lending bank to H & R Block for each loan customer referred to it by H & R Block. The fee has ranged from $3 to $9 per loan. Second, through its subsidiary, H & R Block Financial, H & R Block purchases about one-half of the RALs from the lender banks. This fact is also not disclosed to the H & R Block customer. Finally, H & R Block has arranged with Sears, Roebuck & Company (Sears) for H & R Block to receive 15% of the check-cashing fee that Sears charges for cashing BNB loan checks. Many H & R Block offices are located at Sears, and H & R Block encourages RAL customers to cash their RAL checks there. This arrangement with Sears is also not disclosed to H & R Block customers. Thus, for each RAL it procures, the lending banks effectively return a portion of the finance charge back to H & R Block, and H & R Block may additionally benefit as a result of profits earned from its purchase of RALs through its subsidiary or from the RAL customer's cashing of the check at a Sears store.

### B.

Green's claims turn on H & R Block's failure to disclose the various ways it may benefit from the RAL program. She labels these various benefits illegal "kickbacks" and asserts

that they are in violation of the fiduciary obligations H & R Block owes to its customers as a result of an agency relationship. The complaint generally alleges that H & R Block's fiduciary obligations arise out of the contract by which H & R Block prepares and files the tax returns, H & R Block's role with respect to the loan application, H & R Block's advertising campaigns, and H & R Block's procedures for encouraging customers to use its RAL service.

According to the amended complaint, for consumers who contract with H & R Block for tax preparation and filing, H & R Block undertakes a fiduciary duty in the form of an agency relationship "to both explain and/or prepare . . . the various options, elections, forms and documents involved in an individual's tax preparation matters, including those involved with the taxpayer obtaining back any tax refund he or she was owed by the government." This duty pertains to all matters within the scope of the taxpayer/tax preparer relationship, including assuring that the amount of refund a customer receives is the maximum amount or the additional taxes required to be paid is the minimal amount. As evidence of the agency relationship, Green points out that H & R Block agrees to accompany the taxpayer to any IRS audit should one be required.[2] Further, H & R Block's tax preparers offer general tax advice for retirement and for the sale of residences. Regarding the RAL program, Green alleges that H & R Block acts as the customer's agent in preparing and explaining the loan application and forwarding the application to the lender bank.

As further support for her claim that a fiduciary relationship exists between H & R Block and its customers, Green emphasizes the context in which H & R Block offers and provides its services, particularly its promotional activities. H & R Block's advertising campaigns create "the impression that

---

**2.** The documentation H & R Block gives to its customers states: "If your income tax return is audited, H & R Block will appear with you at that audit and explain how your refund was prepared, even though we cannot act as your legal representative."

[H & R] Block and its tax preparation offices and personnel are trustworthy," Green alleges. These advertisements tell consumers to "[d]o what millions of Americans do. Trust H & R Block." H & R Block also advertises its ability to obtain tax refunds quickly. Green quotes H & R Block advertisements stating, "WHY WAIT? IT'S YOUR MONEY!" Signs placed at storefronts in Maryland declare: "RAPID RE-FUND. REFUND IN 2 DAYS," and "GET YOUR RE-FUND FAST!" Once these advertisements provoke interest in a consumer who wants a fast refund, H & R Block's goal is to get the consumer to participate in the loan program. The complaint asserts that

> "[H & R Block e]mployees are instructed that, regardless of the reason for the customer's visit, if a return meets RAL Lender's loan requirements, offer the RAL first (*i.e.*, before other means of more quickly obtaining a refund back, including [H & R] Block's electronic filing service and direct deposit), and if the client says yes to that, go no further."

Finally, Green alleges that the RALs are marketed as one of H & R Block's Rapid Refund products even though they are really loans secured by the recipient's anticipated tax refund.

Green concludes that these various advertisements and interactions create an agency relationship between H & R Block and its customers who participate in the RAL program. As discussed below, an agency relationship may carry with it a duty on the part of the agent to disclose information to the principal; it is this duty to disclose which Green asserts that H & R Block has breached. The alleged breaches include, *inter alia*, H & R Block's failure "to disclose the fact that [H & R] Block was receiving money, in the form of kickback payments, from the lenders for the refund anticipation loans entered into by Plaintiff and the Class and/or from Sears in connection with the cashing of the RAL checks"; its failure "to disclose the true nature of the [H & R] Block Defendants' relationship with the lenders as broker or agent for the lenders"; its representation "that obtaining a refund anticipation loan was the only or best means of receiving an expedited tax refund"; its failure to inform consumers that an expedited

return would be available through electronic filing alone, and that an RAL is not in the consumer's best interest.

The amended complaint contained five claims, all of which were dismissed by the trial court on H & R Block's motion to dismiss. We are concerned with Green's appeal of the trial court's dismissal of three of those claims. Those three claims include: (1) breach of fiduciary duty based on an alleged agency relationship between Green and H & R Block; (2) violation of the Maryland Consumer Protection Act; and (3) fraudulent concealment. We granted the writ of certiorari on our own motion prior to consideration of the matter by the Court of Special Appeals.

## II. Standard of Review

The trial court dismissed Green's complaint for failure to state a claim upon which relief may be granted. *See* Maryland Rule 2–322(b)(2). The granting of a motion to dismiss "is proper only if the facts alleged fail to state a cause of action." *A.J. Decoster Co. v. Westinghouse Elec. Co.*, 333 Md. 245, 249, 634 A.2d 1330, 1332 (1994). The granting of a motion of dismiss therefore depends solely on the adequacy of the plaintiff's complaint. The trial court's memorandum opinion, however, contains various references to materials outside of Green's complaint. For example, the trial court referred to exhibits filed with the court by H & R Block. Because the trial court referred to matters outside of the pleadings, the motion should have been treated as a motion for summary judgment.

Maryland Rule 2–322(c) states in pertinent part:

"If, on a motion to dismiss for failure of the pleading to state a claim upon which relief can be granted, *matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment* and disposed of as provided in Rule 2–501, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 2–501." (Emphasis added).

When the court considers matters outside the pleading in ruling on a motion to dismiss and the motion, therefore, should be considered as one for summary judgment, there is a risk that the non-moving party will not be given a reasonable opportunity to present material that may be pertinent to the court's decision, as required by Md. Rule 2–501. In the instant case, however, the trial court's ruling on each of Green's counts appears to have turned on its legal conclusion that the facts failed to establish a fiduciary or agency relationship between H & R Block and its customers, a conclusion that has been fully briefed by the parties to this appeal. It is not apparent, therefore, that Green has suffered any prejudice as a result of the trial court's reference to matters outside the pleading, and we shall treat the trial court's action as the grant of a motion for summary judgment.[3]

H & R Block is entitled to summary judgment only if "there is no genuine dispute as to any material fact and that the party is entitled to judgment as a matter of law." Md. Rule 2–501(a). In determining whether summary judgment was properly granted in favor of H & R Block, we examine whether the trial court was legally correct, taking the facts in the light most favorable to the losing party. *See Heat & Power v. Air Products*, 320 Md. 584, 590–92, 578 A.2d 1202, 1205–06 (1990). Our review is *de novo* since we have "the same information from the record and decide[ ] the same issues of law as the trial court." *Heat & Power*, 320 Md. at 591–92, 578 A.2d at 1206. Where multiple inferences may be drawn from the facts, they must be resolved in favor of the nonmoving party.

---

3. The trial court's ruling, however, took place prior to discovery. Thus, the trial court's granting of H & R Block's motion to dismiss deprived Green of the opportunity to produce additional information that may be relevant to her claims. However, given our ultimate conclusion, the prejudicial effect of entertaining an appeal of an order granting a motion to dismiss as one granting summary judgment is minimized. On remand, Green will have the opportunity to obtain discovery for further facts to support her claim.

### III. Principal-Agent Relationship
### A.

■■ The predominate issue in this appeal involves whether an agency relationship exists between H & R Block and its taxpayer customers, in particular those customers who choose to participate in H & R Block's RAL program. According to the RESTATEMENT (SECOND) OF AGENCY, "Agency is the fiduciary relation which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act." RESTATEMENT (SECOND) OF AGENCY § 1 (1958). The creation of an agency relationship ultimately turns on the parties' intentions as manifested by their agreements or actions. *See Ramsburg v. Sykes*, 221 Md. 438, 442, 158 A.2d 106, 108 (1960); *American Casualty Co. v. Ricas*, 179 Md. 627, 631, 22 A.2d 484, 487 (1941).

■■ While the agent and principal must both consent to the relationship, an agency relationship can be created by express agreement or by inference from the acts of the agent and principal. *Patten v. Board of Liquor*, 107 Md.App. 224, 238, 667 A.2d 940, 947 (1995). "The relation of principal and agent does not necessarily depend upon an express appointment and acceptance thereof, but it may be implied from the words and conduct of the parties and the circumstances." *Medical Mut. Liab. v. Mutual Fire*, 37 Md.App. 706, 712, 379 A.2d 739, 742-43 (1977). *See also Heslop v. Dieudonne*, 209 Md. 201, 206, 120 A.2d 669, 672 (1956)(same).

In recent cases, courts applying Maryland agency law have considered three characteristics as having particular relevance to the determination of the existence of a principal-agent relationship: (1) the agent's power to alter the legal relations of the principal; (2) the agent's duty to act primarily for the benefit of the principal; and (3) the principal's right to control the agent. *See, e.g., United Capitol Ins. v. Kapiloff*, 155 F.3d 488, 498 (4 th Cir.1998); *Proctor v. Holden*, 75 Md.App. 1, 20, 540 A.2d 133, 142, *cert. denied sub nom.*, 313 Md. 506, 545 A.2d 1343 (1988); *Schear v. Motel Management Corp.*, 61

Md.App. 670, 687, 487 A.2d 1240, 1248 (1985). These factors derive from the Restatement (Second) of Agency §§ 12–14 (1958). *See* Restatement (Second) of Agency § 12 (1958)("An agent or apparent agent holds a power to alter the legal relations between the principal and third persons and between the principal and himself."); Restatement (Second) of Agency § 13 (1958)("An agent is a fiduciary with respect to matters within the scope of his agency."); Restatement (Second) of Agency § 14 (1958)("A principal has the right to control the conduct of the agent with respect to matters entrusted to him.").

When a party asserts a claim that is dependent upon an agency relationship created by inference, that party has the burden of proving the existence of the principal-agent relationship, including its nature and its extent. *Hofherr v. Dart Industries, Inc.*, 853 F.2d 259, 262 (4th Cir.1988); *Schear*, 61 Md.App. at 687, 487 A.2d at 1248. In order to defeat a motion for summary judgment, the party's burden is to produce legally sufficient evidence of a principal-agent relationship.

When legally sufficient evidence is produced of an agency relationship, the question of the existence of the agency relationship is a factual matter and must be submitted to the jury. *Faya v. Almaraz*, 329 Md. 435, 460, 620 A.2d 327, 339 (1993)("The existence of an agency relationship is a question of fact which must be submitted to the factfinder if any legally sufficient evidence tending to prove the agency is offered."); *P. Flanigan & Sons v. Childs*, 251 Md. 646, 653, 248 A.2d 473, 476 (1968)(declaring that the existence of an agency relationship is ordinarily a question of fact). "[I]t is not for the court to determine the question of agency *vel non,* but if the testimony as to the fact of the agency tends to prove the existence of that relation, it should be submitted to the jury, who are the exclusive judges of its weight." *Levine v. Chambers,* 141 Md. 336, 343, 118 A. 798, 800 (1922).

If the party alleging the existence of a principal-agent relationship fails to produce sufficient evidence to allow a

reasonable fact finder to conclude that such a relationship exists, then summary judgment would be proper on the agency issue. *See, e.g., Proctor,* 75 Md.App. at 21, 540 A.2d at 142 ("We conclude from our review of the record that the Holdens failed to produce any evidence from which a reasonable inference could be drawn that an agency relationship had been created."). Finally, where only one inference may be drawn from the evidence, it is proper for the court to find the existence of an agency relationship as a matter of law. *Globe Indemnity Co. v. Victill Corp.,* 208 Md. 573, 585, 119 A.2d 423, 429 (1956).

## B.

The trial court determined that no agency relationship had been created between H & R Block and its customers as a matter of law. Citing *Schear, supra,* the trial court's written order stated that "three essential elements must be satisfied" in order to determine the existence of an agency relationship, including (1) the principal's right of control over the agent, (2) the agent's duty to act primarily for the benefit of the principal, and (3) the agent's power to alter the legal relations of the principal. Applying this three-part test and relying largely on decisions of trial courts in other states, the trial court held that Green failed to demonstrate the first and third elements. That holding provided the primary basis for the trial court's dismissal of each of the claims appealed to this Court.

We disagree, at least in part, with the trial court's agency analysis. Initially, as noted above, the primary determination of whether a principal-agent relationship exists involves ascertaining the parties' intent, as evidenced by their agreements and actions:

"There are two fundamental elements for the creation of the agency relationship: (1) some manifestation or indication by the principal to the agent that he consents to the agent's acting for his benefit; and (2) consent by the agent to act for the principal. In sum, the agency relationship can arise

only when there is mutual consent between the two parties that it should arise. However, consent may be inferred from words or conduct, including acquiescence. Whereas, however, some manifestation of the principal's consent must actually come to the attention of the agent, the agent need not necessarily communicate his consent to the principal if, under the circumstances, embarking on the purpose of the agency is, itself, a sufficient indication of consent." (Footnotes omitted).

W. Edward Sell, Sell on Agency § 7, at 7–8 (1975).

 The three factors adopted in *Schear* and used by the trial court in this case provide guidance to determining whether an agency relationship exists. The trial court, however, overstated the significance of the three factors when it labeled them "essential elements" of an agency relationship. The factors are proper considerations for determining agency, but rather than being determinative, the three factors should be viewed within the context of the entire circumstances of the transaction or relations. They are neither exclusive nor conclusive considerations in determining the existence of an agency relationship.

 Nevertheless, contrary to the trial court's conclusions, as discussed next, we conclude that the evidence alleged concerning the "control" and "legal relations" factors supports a finding of agency. After considering those two factors, we examine some of the additional circumstances that would support a factual finding in favor of the existence of an agency relationship in this case.

1.

The trial court concluded that Green's allegations regarding H & R Block's efforts in "preparing their returns, checking the accuracy of their tax returns, electronically filing their tax returns and if necessary, accompany[ing] them to IRS audits" were insufficient to demonstrate that Green had the right to control H & R Block's conduct. The quoted text indicates that the trial court's emphasis was on H & R Block's activities

as a tax preparer and tax filer, rather than its activities in procuring a loan for its customers secured by the anticipated tax refund. Although related to H & R Block's tax activities, the more pertinent question involves whether H & R Block was acting as Green's agent with respect to the RAL transaction. Indeed, at oral argument H & R Block conceded that it acts as an agent for its customers for the purposes of preparing the tax return and filing it with the IRS. The question we must address, however, is whether sufficient facts are alleged to support a reasonable inference that either H & R Block was Green's agent with respect to the RAL transaction, or that the scope of H & R Block's status as its customer's agent for preparing and filing the tax return is broad enough to encompass its role in the RAL process.

Green contends that the loan agreement provides the control element for a finding of an agency relationship between H & R Block and its customers with respect to the RAL. The loan application authorizes H & R Block to disclose to the bank the customer's federal income tax return "for the purpose of enabling BNB to determine whether or not to make a Refund Anticipation Loan ("RAL") to me in response to my application for such loan which is a part of this form." The authorization goes on to limit H & R Block's use of the information: "H & R Block may not use or disclose such tax return information or such other information for any purpose ... other than as stated herein." H & R Block apparently concedes that the authorization clause may create an agency relationship between H & R Block and its customers for transmitting the RAL application but argues that "once [H & R] Block successfully transmitted the required information to the RAL lender, any agency relationship—and any corresponding liability for breach of fiduciary duty—was terminated."

H & R Block misconstrues the level of control necessary for establishing a principal-agent relationship. The control a principal must exercise over an agent in order to evidence an agency relationship is not so comprehensive. A

principal need not exercise physical control over the actions of its agent in order for an agency relationship to exist; rather, the agent must be subject to the principal's control over the result or ultimate objectives of the agency relationship.

 Often an agent is left free from direct supervisory control as he or she furthers the interest of the principal. As explained by RESTATEMENT (SECOND) OF AGENCY § 14 cmt. a (1958), "The control of the principal does not ... include control at every moment; its exercise may be very attenuated and ... may be ineffective." *See also* PHILIP MECHEM, ME-CHEM OUTLINES AGENCY § 12, at 5 (4th ed. 1952)("[T]he agent does not work for [the principal] physically, nor is he subject to the control of [the principal] in his physical actions."). Indeed, there are circumstances under which very little control is exercised by the principal.

> "If it is otherwise clear that there is an agency relation ... the principal, although he has contracted with the agent not to exercise control and to permit the agent the free exercise of his discretion, nevertheless has the power to give lawful directions which the agent is under a duty to obey if he continues to act as such."

RESTATEMENT (SECOND) OF AGENCY § 14 cmt. b (1958).

 The level of control a principal must exercise over the agent becomes more clear when it is contrasted with the control exercised by the master in a master-servant relationship. In *Globe Indemnity Co., supra,* a hotel employee sought to hold vicariously liable the employer of a business guest who had assaulted him. We discussed the difference between the control a master has over a servant and the control a principal has over an agent:

> "It is important to distinguish between a servant and an agent who is not a servant, because ordinarily a principal is not liable for the incidental acts of negligence in the performance of duties committed by an agent who is not a servant. An agent is a person who represents another in contractual negotiations or transactions akin thereto. *A servant is a person who is employed to perform personal services for*

*another in his affairs, and who, in respect to his physical movements in the performance of the service, is subject to the other's control or right of control. Persons who render service but retain control over the manner of doing it are not servants.*

We reaffirm the rule that a principal is not liable for any physical injury caused by the negligent conduct of his agent, who is not a servant, during the performance of the principal's business, unless the act was done in the manner authorized or directed by the principal, or the result was one authorized or intended by the principal. *A principal employing an agent to accomplish a result, but not having the right to control the details of his movements,* is not responsible for incidental negligence while such agent is conducting the authorized transaction. 1 *Restatement, Agency,* sec. 250." (Emphasis added).

*Globe Indemnity Co.,* 208 Md. at 581–82, 119 A.2d at 427. As the emphasized text demonstrates, a principal who is not an employer need not "control the details" nor the "physical movements" of the agent.

More recently, in *Chevron, U.S.A., Inc. v. Lesch,* 319 Md. 25, 570 A.2d 840 (1990), we again discussed the control necessary to establish a master-servant relationship in the context of determining an alleged principal's liability to a third party for the purported agent's tort. The plaintiff, Lesch, alleged that Chevron, a national gasoline distributor, should be liable as a master for the actions of its alleged servant, a local service station. We explained:

*"One may be an agent of another, owing to his principal the fiduciary obligations of loyalty and general obedience, but at the same time not be sufficiently under the control of the principal to be considered a servant.* The relationship of master and servant exists only when the employer has the right to control and direct the servant in the performance of his work and in the manner in which the work is to be done.

\* \* \*

'The decisive test in determining whether the relation of master and servant exists is whether the employer has the *right to control and direct the servant in the performance of his work and in the manner in which the work is to be done.*'" (Citations omitted)(emphasis added and supplied). *Chevron, U.S.A., Inc.,* 319 Md. at 32–33, 570 A.2d at 844 (quoting *Keitz v. National Paving & Contracting Co.,* 214 Md. 479, 491, 134 A.2d 296, 301 (1957)).

These cases make clear that the level of control a principal exercises over an agent is less than the level of control a master has over a servant. Indeed, the level of control a master exercises over a servant is a key factor distinguishing the master-servant subset of the set of principal-agent relationships. In other words, all masters are principals and all servants are agents, but only when the level of control is sufficiently high does a principal become a master and an agent a servant. *See* RESTATEMENT (SECOND) OF AGENCY § 2 cmt. a (1958)("A master is a species of principal, and a servant is a species of agent."). *See also E. Coast Freight Lines v. M. & C.C. of Balto.,* 190 Md. 256, 58 A.2d 290 (1948)(contrasting the master-servant relationship with the principal-agent relationship). Thus, principals who are not masters exercise a much lesser degree of control over their agents than masters do over their servants.

In sum, the control a principal exercises over its agent is not defined rigidly to mean control over the minutia of the agent's actions, such as the agent's physical conduct, as is required for a master-servant relationship. The level of control may be very attenuated with respect to the details. However, the principal must have ultimate responsibility to control the end result of his or her agent's actions; such control may be exercised by prescribing the agents' obligations or duties before or after the agent acts, or both. *See Smalich v. Westfall,* 440 Pa. 409, 269 A.2d 476, 481 (1970)(quoting *Commonwealth v. Minds Coal Mining Corporation,* 360 Pa. 7, 60 A.2d 14, 20 (1948))("Those rendering service but retaining control over the manner of doing it are

not servants. They may be agents, agreeing only to use care and skill to accomplish a result. . . .").

Applying this analysis to the instant case, we conclude that it would be reasonable to infer that H & R Block's customers retain control over H & R Block's ultimate actions and representations with respect to filing the tax return and applying for the RAL. Viewed most favorably to Green, H & R Block's relationship with its customers is analogous to other principal-agent relationships, such as between an attorney and his or her client. *See* Md. Rule 1–331 ("Attorney may act for party."); *Salisbury Beauty Schools v. St. Bd.*, 268 Md. 32, 300 A.2d 367 (1973)(holding that attorney's actions within scope of retainer are binding on the client under ordinary agency principles). An attorney who, for example, serves as his or her client's representative in negotiations to settle a lawsuit is generally not subject to the client's control over the best strategy to use in order to arrive at a good settlement, but the client controls the final decision as to whether to settle or not. The client/principal may have little knowledge of the law or negotiating strategies and so trusts the attorney/agent to further his or her interests in the settlement negotiations.

Similar to the client who is represented by an attorney in settlement negotiations, the H & R Block customer may be unknowledgeable in tax and financial matters, trusting H & R Block to further his or her interests. Like the attorney representing a client in settlement negotiations, H & R Block undertakes to file customer tax returns with the IRS and the loan application with the bank, but only at the direction of the customer, who ultimately controls whether H & R Block takes either action with respect to the third party. It is not dispositive, as the trial court implied, that H & R Block's customers do not generally exercise control over the manner in which H & R Block prepares the tax filings. Indeed, H & R Block conceded at oral argument that it serves as its customers' agent for the purpose of filing the tax return and transmitting the loan application to the lender. Thus, H & R Block's customers retain enough control over H & R Block to support a finding of an agency relationship. Our conclusion is

in accord with the only other appellate opinion, of which we are aware, that has addressed the identical issue. *See Basile v. H & R Block, Inc.*, 729 A.2d 574 (Pa.Super.Ct.1999)(holding in a similar lawsuit that H & R Block's customers exercise enough control to evidence an agency relationship).

### 2.

We also disagree with the trial court's analysis regarding H & R Block's ability to alter the legal relations of its customers. The trial court concluded that the complaint "fails to allege that Defendants had been granted or accepted or had the power to alter the legal relations of Plaintiff." Because H & R Block's customers actually sign the loan application, and not H & R Block, the trial court concluded that Green "fail[ed] to demonstrate that [H & R Block] had the authority to represent Plaintiff in her transactions with RAL lenders . . . ."

When the facts otherwise demonstrate an agency relationship, that relationship cannot be negated simply because the principal's and not the agent's signature appears on a document otherwise prepared and negotiated by the agent. Such a result would create a legal fiction contrary to the substantive reality. For example, as noted above, an attorney may represent a client in a settlement negotiation as an agent of the client; if the client ultimately signs the settlement papers, that fact does not alter the attorney's status as an agent of his or her client. Similarly, a principal may hire a consultant to negotiate a business transaction; the principal's signing of the contract would not necessarily negate what is otherwise a principal-agent relationship.

In the instant case, Green alleges that a contract existed under which H & R Block would prepare and transmit her RAL application to the bank, obtain the bank's acceptance of the application, and then receive and deliver to her the proceeds of the loan. A reasonable inference is that, although it is the H & R Block customer's signature on the loan application, it is H & R Block's role in implicitly endorsing the contents of the application that lowers the perceived risk to the bank of providing the loan. Moreover, the RAL applica-

tion expressly authorizes H & R Block to share the customer's tax return and related information, which H & R Block itself prepared admittedly as its customer's agent. Finally, the bank delivers the loan check to H & R Block, which holds it and turns it over to its customer. It is therefore reasonable to infer that H & R Block played an integral part in the customer's receipt of the bank loan, which indisputedly has legal ramifications for the H & R Block customer and the bank. Furthermore, as Green contends, discovery may disclose other means by which H & R Block affected its customers' legal relations with third-party lenders.

3.

Other circumstances alleged by Green provide further support for a jury to conclude that Green consented to H & R Block acting on her behalf and that H & R Block consented to act for Green, thus establishing the intent necessary to create an agency relationship. Through its national and local efforts advertising its tax preparation and refund services, H & R Block strives to convince potential customers that it can be "trusted" to obtain both the highest and fastest possible refunds for its customers. Its advertisements call on consumers to "Do what millions of Americans do. Trust H & R Block." H & R Block declares that it "watch[es] over" its customers and that "you can trust H & R Block." H & R Block promotes itself as having the expertise to achieve the maximum allowable tax return, with the customer secure in the knowledge that, if necessary, an experienced tax preparer "will appear with you at [an] audit and explain how your refund was prepared...." Finally, H & R Block's advertisements promoting its ability to secure a "Rapid Refund" constitute an integral part of its promotional efforts. *See Basile*, 729 A.2d at 581 (discussing H & R Block's media efforts and concluding that an agency relationship had been formed).

Customers who enter the doors of the local H & R Block office therefore may reasonably believe that H & R Block is acting on their behalf—to obtain the highest and fastest return possible—in the preparation and filing of the tax

returns with the IRS and, in the case of the RAL, in acting as the intermediary to the transactions with the lending bank. The internal procedures H & R Block has established for its employees tell them to encourage those qualifying for RALs to pursue them. H & R Block's general advertising seeks to gain customer trust in not only filing tax returns, but also in obtaining a "Rapid Refund," and its RAL program is an integral part of its Rapid Refund program. Thus, both before they enter H & R Block's offices and while they are there, H & R Block customers are encouraged to trust H & R Block to help them get a maximum return more quickly than conventional filing methods.

Particularly in the context of its promotional efforts, it would be reasonable to conclude that H & R Block, as an agent, is seeking—and gaining—the consent of its customers to act on their behalf with respect to the transactions with the lending bank as well as the IRS. While H & R Block disputes that it has consented to act as its customers' agent in securing the loan, an "agent need not necessarily communicate his consent to the principal if, under the circumstances, embarking on the purpose of the agency is, itself, a sufficient indication of consent." W. EDWARD SELL, SELL ON AGENCY § 7, at 8 (1975). H & R Block intended to create the circumstances under which customers would trust it to obtain the maximum refund fast, and it embarked on efforts to secure a loan in order to gain the refund quickly. In light of H & R Block's conduct, its customers may reasonably believe that H & R Block is acting as their agent. *Cf.* RESTATEMENT (SECOND) OF CONTRACTS § 20(2) (1981)("The manifestations of the parties are operative in accordance with the meaning attached to them by one of the parties if ... that party does not know of any different meaning attached by the other, and the other knows the meaning attached by the first party; or ... that party has no reason to know of any different meaning attached by the other, and the other has reason to know the meaning attached by the first party.").

Viewing the facts most favorably to Green, H & R Block's role is similar to that of an insurance broker who acts as the agent for its customers seeking insurance. In *Ricas, supra,* we addressed whether an insurance broker who placed policies with a number of insurers and who was not employed by any single insurer was an agent of the insurer. We concluded that, if anything, the broker was an agent of the insured, not the insurer. We said that

"an insurance solicitor, or broker, is one who acts as a middle man between the assured and the insurer, and who solicits insurance from the public under no employment from any special company, but having secured an order, either places the insurance with a company selected by the assured, or in the absence of any selection by him, then with a company selected by the broker. *Ordinarily, the relation between the insured and the broker is that between principal and agent.*" (Emphasis added).

*Ricas,* 179 Md. at 631, 22 A.2d at 487.

While in the instant case H & R Block apparently does not represent to customers that it will shop prospectively among banks for the best loan, customers may reasonably believe that H & R Block has already "shopped" to find the best loan package for its customers. It therefore would be reasonable to conclude that H & R Block customers reasonably believed that H & R Block is operating as their broker for a loan much as the broker in *Ricas*—finding for its customers the best loan package that fulfills H & R Block's twin commitments of maximizing tax refunds in terms of amount and speed.

Furthermore, as noted above, at oral argument H & R Block conceded that it operates as the customer's agent for the purposes of preparing and filing the tax returns. With respect to the RAL customer, H & R Block argued that instead of serving as the customer's agent to the bank, it serves as the bank's agent to the customer. Under H & R Block's analysis, the customer arrives at an H & R Block office for tax help, perhaps desiring a Rapid Refund. H & R Block then serves as the customer's agent for preparing the

taxes. When it becomes known that the customer qualifies for an RAL, H & R Block instantaneously changes hats, becoming the agent *of the bank* and terminating its agency relationship with the customer, and then offering the customer the RAL service. H & R Block contends that these various transactions should be treated distinctly so as to avoid the conclusion that it is the agent of the customer for the loan transaction. Its role in facilitating the loan, H & R Block argues, is separate from its role as tax preparer and filer.

There are several problems with H & R Block's analysis. First, assuming that H & R Block is the bank's agent, H & R Block still may be the customer's agent, even though its dual agency status may create liability problems arising from divided loyalties, as discussed in Part IV.A, *infra*. Second, H & R Block concedes that it serves as its customers' agent to the lending bank for the limited purpose of transmitting the loan application and tax information to the bank, in light of the written form that its customers sign authorizing such transmission. Thus, even within the context of a single loan transaction, H & R Block serves two different principals without disclosing that fact. Third, it is not at all clear that H & R Block has completed its obligations as the agent of its customers prior to becoming the bank's agent. It would appear that H & R Block cannot file its customer's tax return until after the RAL has been approved by the bank, since the IRS must be told to deposit the taxpayer's refund directly into the bank account that the lending institution created for the H & R Block RAL customer in order to secure the loan. Thus, even under its own analysis, H & R Block begins acting as the bank's agent before it has completed its agency obligations for its customers.

We are unconvinced that, as a matter of law, H & R Block can so conveniently end one agency relationship and begin another simply by treating what may reasonably be construed as a package of related services as unrelated distinct transactions. H & R Block's attempt to break down its activities into individual transactions raises the very question that must be resolved by the jury—what is the scope of H & R Block's

undertaking as the agent of its customers? The facts alleged allow for the reasonable inference that H & R Block and its customers, through their objective manifestations, mutually consented and intended to form a principal-agent relationship, the scope of which included obtaining the maximum amount of tax refund quickly, and that H & R Block was acting as its customers' agent in matters pertaining to the refund loan. The trial court therefore incorrectly concluded that as a matter of law there was no agency relationship between H & R Block and its customers.

## IV. Causes of Action

We now turn to Green's claims that were dismissed by the trial court and appealed to this Court. We accordingly address Green's claim for breach of the principal-agent relationship, the claim for violation of the Maryland Consumer Protection Act, and finally the fraudulent concealment claim.

### A. Breach of the Principal-Agent Relationship

The duties an agent owes to his or her principal are well established. An agent has "a duty to his principal to act solely for the benefit of the principal in all matters connected with his agency." RESTATEMENT (SECOND) OF AGENCY § 387 (1958). We have recognized the

> " 'universal principle in the law of agency, that the powers of the agent are to be exercised for the benefit of the principal *only, and not of the agent or of third parties.* A power to do all acts that the principal could do, or all acts of a certain description, for and in the name of the principal, is limited to the doing of them for the use and benefit of the principal only, *as much as if it were so expressed.*' " (Emphasis in original).

*King v. Bankerd,* 303 Md. 98, 108–09, 492 A.2d 608, 613 (1985)(quoting *Adams' Express Co. v. Trego,* 35 Md. 47, 67 (1872)). Moreover, an agent is under a strict duty to avoid any conflict between his or her self-interest and that of the principal: " 'It is an elementary principle that the fundamental duties of an agent are loyalty to the interest of his principal

and the need to avoid any conflict between that interest and his own self-interest.' " *C–E–I–R, Inc. v. Computer Dynamics Corp.*, 229 Md. 357, 366, 183 A.2d 374, 379 (1962)(quoting *Maryland Credit v. Hagerty*, 216 Md. 83, 90, 139 A.2d 230, 233 (1958)). As Professor Mechem has observed:

> "It is the duty of the agent to conduct himself with the utmost loyalty and fidelity to the interests of his principal, and not to place himself or voluntarily permit himself to be placed in a position where his own interests or those of any other person whom he has undertaken to represent may conflict with the interests of his principal."

PHILIP MECHEM, MECHEM OUTLINES AGENCY § 500, at 345 (4 th ed.1952). *See also* RESTATEMENT (SECOND) OF AGENCY § 389 cmt. a (1958)("[A]n agent who is appointed to sell or to give advice concerning sales violates his duty if, without the principal's knowledge, he sells to himself. . . .").

 One of the primary obligations of an agent to his or her principal is to disclose any information the principal may reasonably want to know. *See Impala Platinum v. Impala Sales*, 283 Md. 296, 324, 389 A.2d 887, 903 (1978)(quoting *Herring v. Offutt*, 266 Md. 593, 597, 295 A.2d 876, 879 (1972))(recognizing duty of fiduciary "to make full disclosure of all known information that is significant and material to the affairs" of the fiduciary relationship); *C–E–I–R, Inc.*, 229 Md. at 367, 183 A.2d at 379–80 ("[T]he rule is well established that an agent is under a duty to disclose to his [principal] any information concerning the agency which the [principal] would be likely to want to know."). The obligation to disclose is strongest when a principal has a conflicting interest in a transaction connected with the agency. *See* RESTATEMENT (SECOND) OF AGENCY § 389 (1958) ("Unless otherwise agreed, an agent is subject to a duty not to deal with his principal as an adverse party in a transaction connected with his agency *without the principal's knowledge.*")(emphasis added). An agent's failure to disclose information material to the agency thus constitutes a breach of the principal-agent relationship.

 Where an agent breaches a duty to the principal and profits from the breach, the principal may maintain an action to recover those profits for her or himself. *Nagel v. Todd,* 185 Md. 512, 517, 45 A.2d 326, 328 (1946)(An agent "cannot make a secret profit out of any transaction with his principal."); RESTATEMENT (SECOND) OF AGENCY § 388 (1958)("[A]n agent who makes a profit in connection with transactions conducted by him on behalf of the principal is under a duty to give such profit to the principal."). An example of such an action is found in *Gussin v. Shockey,* 725 F.Supp. 271 (D.Md.1989), *aff'd* 933 F.2d 1001 (4th Cir.1991). Frederic and Paul Gussin entered into an agreement with Richard Shockey who was to assist them in buying, maintaining, breeding, and selling thoroughbred horses. The Gussins had no experience in the horse business and relied on Shockey's 20 years of experience buying and selling horses. The Gussins were to pay Shockey 5% of the net proceeds on the sale of the horses. Without the Gussins' knowledge, in arranging the purchases of various horses, Shockey received commissions from the sellers by negotiating a base price above which the seller would pay him the proceeds. For example, for one horse Shockey arranged a base price of $525,000 and a total price of $650,000. He informed the Gussins that the price was $650,000, and upon the Gussins' payment, the seller issued a check of $125,000 to Shockey as a "commission"—or as the Gussins called it, a "kickback." Shockey never informed the Gussins about the "commission" arrangements he made with the various sellers.

Shockey contended that although the Gussins trusted him and relied on his advice, he was not obligated to get the best price on the horses for the Gussins. Applying Maryland agency law, the court rejected Shockey's argument, finding there was an agency relationship and that Shockey had breached it:

"If the agent is to receive any benefit from a transaction in which he is serving his principal, the agent must fully disclose any interest he has in the transaction and receive the consent of his principal to proceed, even if the principal

ultimately was to benefit from the transaction." (Citation omitted).

*Gussin*, 725 F.Supp. at 275.

The instant case resembles *Gussin* in a number of ways. In essence, Green alleges that H & R Block advised her to take a loan that included benefits for H & R Block that H & R Block did not disclose. Green has identified three ways in which H & R Block benefits from the RALs—the "license fee" paid to H & R Block by the lending institution for each RAL, ranging from $3 to $9; H & R Block's profits from the purchase of the RALs through its subsidiary H & R Block Financial; and 15% of the check cashing charge if the loan check is cashed at Sears. Just as the Gussins paid for the horses at the price they were told by Shockey, H & R Block customers were informed that the "finance charge" was the bank's price for providing the loan. And just as Shockey breached his duty to the Gussins by failing to disclose his benefit from the transaction, so to did H & R Block breach its duty to disclose its secret benefits, assuming that Green succeeds in convincing the jury of the existence of an agency relationship.

H & R Block contends that its customers have not been harmed by the RAL program since they enter into the RAL transaction fully aware of the total "finance charge" which they must pay in order to obtain the loan based on their tax refund. The argument is similar to the one made by Shockey in *Gussin*, that since the Gussins agreed to pay the total price for the horse, the undisclosed commission received by Shockey did not result in any harm to the Gussins. Although the harm caused by H & R Block's failure to disclose may be much smaller for any individual H & R Block customer than in *Gussin*, the nature of the agent's alleged action is virtually identical in both cases, and there is no minimum value below which an agent may freely take undisclosed profits from his or her principal.

Furthermore, Green need not prove she was harmed at all in order to maintain an action based on a breach of the principal-agent relationship. The rule against dealing

with a principal as an adverse party without the principal's knowledge

> "is not based upon the existence of harm to the principal in the particular case. It exists to prevent a conflict of opposing interests in the minds of agents whose duty it is to act solely for the benefit of their principals. The rule applies, therefore, even though the transaction between the principal and the agent is beneficial to the principal."

RESTATEMENT (SECOND) OF AGENCY § 389 cmt. c (1958). *See also Carey v. Safe Dep. & Tr. Co.,* 168 Md. 501, 513, 178 A. 242, 247(1935) ("The rule is that an agent cannot represent two principals having antagonistic interests, and that he cannot make a secret profit out of any transaction with his principal. This rule applies whether or not the interest or profit of the agent causes any loss to the principal."); *De Crette v. Mohler,* 147 Md. 108, 115, 127 A. 639, 642 (1925)(same); PHILIP MECHEM, MECHEM OUTLINES AGENCY § 507, at 350–51 (4th ed. 1952)("It makes no difference that the principal has not been injured, or that the agent has given him as good terms as anybody would, or even perhaps better terms, or that the sale or purchase has been at the price fixed by the principal; or that there was no bad faith or intention to defraud....").

In sum, H & R Block had several interests in the loan transaction by virtue of the license agreement, its purchase of loans from the banks, and its arrangement with Sears. These interests in the loan transaction posed a conflict between H & R Block's interests and those of its customers. Thus, assuming the existence of an agency relationship and viewing the facts in the light most favorable to Green, H & R Block was required to disclose those interests affecting its ability to act solely for the benefit of its customers.

### B. Consumer Protection Act Violation

We next address Green's claim that H & R Block violated Maryland's Consumer Protection Act (CPA). *See* Maryland Code (1975, 1990 Repl.Vol. & 1998 Supp.), Commercial Law

Article, §§ 13–101 through 13–501.[4] The CPA was intended to "set certain minimum statewide standards for the protection of consumers across the State . . . ." § 13–102(b)(1). The CPA prohibits a person from engaging in "any unfair or deceptive trade practice" involving sales or offers for sale of consumer goods and services. § 13–303. Section 13–301 defines "unfair or deceptive trade practices." It states in pertinent part:

"Unfair or deceptive trade practices include any:

(1) False, falsely disparaging, or misleading oral or written statement, visual description, or other representation of any kind which has the capacity, tendency, or effect of deceiving or misleading consumers;

\* \* \*

(3) Failure to state a material fact if the failure deceives or tends to deceive;

\* \* \*

(9) Deception, fraud, false pretense, false premise, misrepresentation, or knowing concealment, suppression, or omission of any material fact with the intent that a consumer rely on the same in connection with:

(i) The promotion or sale of any consumer goods, consumer realty, or consumer service . . . ."

The trial court dismissed Green's CPA claim in its written order, which stated as follows: "Absent a fiduciary relationship, Defendants have no duty as a matter of law to disclose the existence of . . . any alleged kickbacks or to disclose that the RAL fees were not favorable and or appropriate. Thus, absent a fiduciary relationship, any failure to disclose on the part of Defendants is not actionable." Even if a duty was owed, the court ruled, the loan application provided sufficient disclosure and "Plaintiff ha[d] failed to allege a material misrepresentation or omission."

---

**4.** Hereinafter all statutory references shall be to Maryland Code (1975, 1990 Repl.Vol. & 1998 Supp.), Commercial Law Article.

We disagree with the trial court's conclusion that "absent a fiduciary relationship, any failure to disclose on the part of Defendants is not actionable." The CPA does not prohibit unfair or deceptive trade practices only between fiduciaries. Rather, it flatly prohibits the statutorily defined unfair or deceptive trade practices regardless of the relation between the consumer and the merchant. Its purpose is to address the legislature's "concern[ ] that public confidence in merchants offering goods, services, realty, and credit is being undermined." § 13–102(b)(2). Green's CPA claim therefore should not have been dismissed for lack of a fiduciary duty to disclose.[5]

We also disagree with the trial court's alternate holding that Green failed to allege a material omission. Green's amended complaint alleges, *inter alia*, that H & R Block failed to disclose material facts in violation of § 13–301(3) and § 13–301(9) in connection with the sale of a consumer service. *See* § 13–303. As discussed above, the facts that Green alleges are material include the various ways in which it stands to benefit from a customer's use of the RAL service. Green contends that the finance charge described in the loan application under the heading "Beneficial National Bank Rapid Refund Loan Disclosure Statement" misleads consumers into believing that the bank receives the full benefit of the finance charge. Indeed, H & R Block concedes that it never advises its RAL customers that the "finance charge" includes an amount that is channeled back to it through the license fee, nor does it inform its customers of the other ways it stands to benefit from the RAL process. The trial court concluded that Green "failed to demonstrate that the information she contends was concealed, omitted or misrepresented would have altered her decision to apply for a RAL or even utilize [H & R] Block."

---

**5.** Even if we were to agree with the trial court's interpretation of the Maryland Consumer Protection Act (CPA), Green's CPA claim would have to be remanded in light of our conclusion that Green has alleged sufficient facts to support the finding of a principal-agent, *i.e.*, fiduciary, relationship.

Ordinarily the question of materiality should not be treated as a matter of law. An omission is material if a significant number of unsophisticated consumers would find that information important in determining a course of action. *Luskin's v. Consumer Protection,* 353 Md. 335, 358–59, 726 A.2d 702, 713 (1999); *Golt v. Phillips,* 308 Md. 1, 10, 517 A.2d 328, 332 (1986); *State v. Cottman Transmissions,* 86 Md.App. 714, 723, 587 A.2d 1190, 1194, *cert. denied,* 324 Md. 121, 596 A.2d 627 (1991). *See also* RESTATEMENT (SECOND) OF TORTS, § 538 (1977)(observing that in common law fraud action, a fact is deemed material if a reasonable person would attach importance to its existence in determining his choice of action.). In the usual case, whether an omission would be important to a significant number of unsophisticated consumers is a question of fact for the jury and not a question of law for the court. Only when the facts do not allow for a reasonable inference of materiality or immateriality should the issue be decided as a matter of law. *See Golt,* 308 Md. at 10, 517 A.2d at 332 (holding as a matter of law that a landlord's failure to disclose fact that rental space was unlicensed in violation of city building code is material). In the instant case, a reasonable inference from the facts alleged is that H & R Block customers may consider important the knowledge that the "finance" cost of the loan is inflated by virtue of the various ways H & R Block stands to benefit.

In the instant case, Green contends that consumers may have changed their course of action had H & R Block disclosed the benefits it received as a result of its relations with the lending bank. In essence, Green asserts that had H & R Block disclosed the benefits it receives from each RAL, customers would have known that the true finance charge of the bank is less than that stated on the RAL application, perhaps causing them to either forgo the loan or obtain a loan at another institution where they would not have to pay the extra cost of the "kickbacks" going to H & R Block. We cannot say as a matter of law whether consumers would consider the undisclosed benefits H & R Block receives from the RAL material to their decision to take out a loan through H & R

Block's program. The jury may reasonably conclude that consumers are indifferent to whether H & R Block receives a portion of the finance charge. However, the evidence also permits a fact finder to conclude that the characterization of the cost of the loan as a "finance charge" without further disclosure misleads consumers who would consider it an important factor in determining whether to pursue the loan through H & R Block. We will therefore remand the question of whether H & R Block's failure to disclose was material.

## C. Fraudulent Concealment

 Finally, we turn to Green's claim alleging fraudulent concealment. Both parties agree on the essential elements of a claim for fraudulent concealment. They include: (1) the defendant owed a duty to the plaintiff to disclose a material fact; (2) the defendant failed to disclose that fact; (3) the defendant intended to defraud or deceive the plaintiff; (4) the plaintiff took action in justifiable reliance on the concealment; and (5) the plaintiff suffered damages as a result of the defendant's concealment. *See Finch v. Hughes Aircraft Co.,* 57 Md.App. 190, 231–32, 469 A.2d 867, 888, *cert. denied,* 298 Md. 310, 469 A.2d 864, 300 Md. 88, 475 A.2d 1200 (1984), and *cert. denied,* 469 U.S. 1215, 105 S.Ct. 1190, 84 L.Ed.2d 336 (1985).

The trial court's reasoning for dismissing the fraudulent concealment claim is found in the following paragraph of the written order:

"Defendants argue and this Court agrees that they have no duty to disclose the matters that Plaintiff alleges were concealed because they owed no fiduciary duty to Plaintiff as a matter of law. Despite having no duty to disclose certain facts, Defendant nonetheless did. For example, in 1995, the loan application stated that 'because the APR on a RAL may be high in certain cases relative to other sources of credit, you may wish to use such sources, *e.g.*, credit cards, equity lines, etc., instead of an RAL'.... In addition Plaintiff alleges that Defendants concealed the fact that an expedited tax refund was available, 'without obtaining a

refund anticipation loan and without paying finance charges.' However, each Loan Application states, 'your income tax return can be filed electronically without obtaining an RAL and, subject to IRS processing, the usual time within which you can expect to receive a refund if you file electronically and without a RAL is two weeks from the date you filed.' Therefore, Plaintiff's claim for fraudulent concealment must be dismissed."

We need not address in detail the trial court's dismissal of Green's fraudulent concealment claim. Again, the trial court dismissed this claim based on its determination that H & R Block owed no fiduciary duty to Green and thus had not met the first requirement for maintaining an action for fraudulent concealment, a duty to disclose. As Part III.B, *supra,* concludes, H & R Block may indeed owe its customers a fiduciary duty arising out of a principal-agent relationship. Whether a principal-agent relationship exists will be determined on remand; therefore, the duty element of Green's fraudulent concealment claim should be reexamined in light of that outcome.

Alternatively, the trial court ruled that even if H & R Block had a duty to disclose, it fulfilled that duty by disclosing the cost of the loan, the interest rate involved, and the general existence of other alternatives to the RAL. The essence of Green's claim, however, relates not to H & R Block's failure to disclose the interest rate itself or the existence of alternatives to the RAL; rather, Green's central allegation relates to H & R Block's failure to disclose the "true nature" of its RAL program, in particular, the various ways it stands to benefit from the customer's agreement with the lending bank. For example, Green alleged that H & R Block failed to disclose that it was "receiving money, in the form of kickback payments, from the lenders for refund anticipation loans obtained by Plaintiff." Indeed, although H & R Block may disagree with Green's labeling of its interests as "kickbacks," it concedes that it never disclosed to customers its various interests in the loan program.

The trial court's ruling did not address H & R Block's admitted failure to disclose the various benefits it receives from the RAL program, despite the implication in the loan documents that the finance charge paid to the bank is the cost of the transaction. Thus, several facts were not disclosed. Assuming an agency relationship exists, the question on remand therefore will involve whether H & R Block's nondisclosure of its interests in the RAL was material. As discussed in Part IV.B, *supra*, the issue of materiality is usually one for the finder of fact and not generally resolved as a matter of law. Because the trial court's ruling did not address the other three elements of fraudulent concealment, we decline to address the parties' arguments concerning those elements and leave those to be dealt with by the trial court on remand.

## V. Conclusion

The creation of an agency relationship ultimately turns on the parties' intentions as manifested by their agreements or actions. When legally sufficient evidence of an agency relationship is produced, the question of the existence of the agency relationship is a factual matter and must be submitted to the jury. In this case, the plaintiff has alleged sufficient facts supporting the existence of an agency relationship that would give rise to a duty of H & R Block to inform its customers of its financial stakes in the RAL program. Because the trial court dismissed all three claims for want of a duty to disclose, the case must be remanded for further consideration.

**JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY REVERSED, AND CASE REMANDED TO THAT COURT FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS TO BE PAID BY APPELLEE.**