**REPUBLIC OF RWANDA**

v.

**Aloys and Emma UWIMANA.**

**Civ.A. No. DKC 2000–CV–763.**

United States District Court,
D. Maryland.

Nov. 22, 2000.

---

Edward S. Wisneski, Patton Boggs, David J. Farber, Patton & Boggs, L.L.P., Washington, DC, for Republic of Rwanda.

Jeffrey A. Vogelman, Christopher S. Moffitt, Alexandria, VA, for Aloys and Emma Uwimana.

## MEMORANDUM OPINION

CHASANOW, District Judge.

This case is before the court on cross appeals[1] from the order of Bankruptcy Judge Paul Mannes, determining that the debtor, Aloys Uwimana, is indebted to the Republic of Rwanda in the amount of $17,-475, and that the debt is not subject to discharge because it resulted from a defalcation by a fiduciary. Oral argument is deemed unnecessary because the facts and legal arguments are adequately presented in the briefs and record, and the decisional process would not be significantly aided by oral argument. *See* Bankr.Rule 8012. For the reasons set forth below the court will AFFIRM the decision of the bankruptcy court.

### I. Background

Aloys Uwimana served as ambassador to the strife-ridden country of Rwanda from October 1987 to July 1994. In April 1994, Rwanda's president was killed, and a transitional government took over the country until July 4, 1994. Between the months of April and July 1994, Rwanda was marked by mass killings and torture, apparently by members of the deceased president's party. The Rwandan Patriotic Front ("RPF"), gained control of the country on July 4 and was sworn in as the country's official government on July 19.

On July 8, 1994, then Rwandan Ambassador Aloys Uwimana signed a Memorandum of Understanding for which $28,000 was transferred on July 13, 1994 into a trust account of attorney Robert W. Johnson.[2] Johnson served as counsel for the Rwandan Working Group ("RWG"). Under the Memorandum of Understanding, the money was meant to fund the RWG in its efforts to perform lobbying and public relations services for Rwanda. Paper no. 7, Appellant's exhibit C1.

Because of mass killings and other violence transpiring in Rwanda, the U.S. Department of State, on July 15, 1994, issued a Note Verbale, which, among other things, ordered official Rwandan embassy functions in the United States to cease by July 22, 1994. Paper no. 7, Appellant's exhibit C14. The Note Verbale also ordered Uwimana, his family and others at the embassy, who were neither citizens nor permanent legal residents of the United States, to leave the country by July 22.

Johnson wrote a letter to Uwimana on July 21, both relating to the work done under the earlier Memorandum of Understanding, and, pursuant to the Note Verbale, outlining new "projects" to be undertaken in light of the imminent shut down of the embassy. On July 22, Uwimana authorized an additional $55,000 to be paid to Johnson. Johnson was to use $30,000 to hire immigration attorneys to help Uwimana, his family and other personnel at the embassy and their families obtain asylum in the United States.[3] Transcript at 82.

---

1. While this case involves cross appeals, for the sake of clarity, throughout this opinion, "Appellant" refers to Rwanda and "Appellee" refers to Mr. Uwimana. Although Mrs. Uwimana is also a named party, Mr. Uwimana is the central figure in this matter, and the court refers only to him throughout the opinion.

2. On appeal, Rwanda appears to have dropped its claim to the $28,000 and only challenges the bankruptcy court's decision to refuse to exempt from discharge $55,000, which was transferred into Johnson's trust account in late July 1994.

3. According to Uwimana's deposition testimony taken in a prior proceeding but read by his attorney during the bankruptcy proceeding, Uwimina claimed that "I had the obligation to protect the Embassy personnel and their families. We had nowhere to go, our country was in war, most of the population had fled

The other $25,000 was to go to Johnson directly as a "fee" for his services in securing lawyers who would oversee the asylum process and for assisting with winding up the embassy business. Uwimana testified that the Prime Minister of Rwanda had authorized his use of the funds for purposes of seeking asylum. *Id.* at 83–84. The bankruptcy court found that Uwimana's testimony on that issue lacked credibility. Indeed, at trial, Rwanda's current Ambassador Joseph Mutaboba testified that the country considers it high treason to use government funds to "defect" without the government's prior knowledge. *Id.* at 57–58. However, Uwimana testified, and the court found, that had Uwimana returned to Rwanda he would have been killed because spending the funds for asylum was considered a crime of high treason, which carries a punishment of death. *Id.* at 108; Paper no. 7, Appellant's exhibit B (hereinafter "Ruling") at 6. Uwimana also testified that had he returned to Rwanda he feared that he would have suffered the same "fate" as members of his family and his wife's family. Transcript at 107. He failed to elaborate on exactly what he meant with respect to the "fate" these other people suffered.

As it turned out, the entire $30,000 earmarked for the immigration services was not needed. For some reason not evident in the record, Boniface Karani and Jean-Baptiste Rwakazina, the other two diplomats for whom Uwimana had sought asylum, found favor with the new Rwandan government. Under the new regime, Karani acted as interim charge d' affaires for several months in 1994 after Uwimana left office. One of Karani's duties was to request that Uwimana and Johnson return some part of the $30,000 that Uwimana had authorized for the asylum matters. A letter dated September 6, 1994, from Karani to Johnson specifically requested that Johnson return to the Rwandan government the $30,000 less money spent for

the country so I had an obligation [to] protect, to secure the personnel and their fami-

Uwimana's immigration and another diplomat's related medical expenses. The letter failed to mention Johnson's $25,000 legal fee. The total amount Karani requested was $17,475. No money was ever returned. The September 6 letter was instrumental in the bankruptcy judge's decision. It reads in full:

> I am writing to confirm the termination of the project "Projects for the Embassy" as for our discussions of September 6, 1994.
>
> By that decision a refund is requested for legal fees related to the immigration business since necessary steps have been taken for only one diplomat family.
>
> Therefore the requested amount is $30,000 less $10,760 legal fees estimated for the said diplomat family and less $1,765 refund to another diplomat for medical expenses related to TPS [temporary protected status] application.
>
> The check to be paid to the Embassy will be of $30,000 − $10,760 − $1,765 = $17,475.

Paper No. 7, Appellant's exhibit C4.

On appeal, Appellant asserts that Uwimana committed defalcation when he transferred the $55,000 to "facilitate his and other's defection, as this transfer was to advance his own interest and not that of the Republic." Paper No. 8 at 12. Next, Appellant argues that the bankruptcy court erred in finding that Karani's September 6 letter "constituted official acknowledgment that Uwimana's transfer of all $55,000 of the Republic's monies was legitimate." *Id.* Finally, the government argues that Judge Mannes erred in holding that Karani's letter placed the $25,000 to Johnson "beyond the reach of the court's jurisdiction." *Id.*

Uwimana argues on appeal that Rwanda should be precluded from recovery because as a "persecuting regime" the country has unclean hands. Paper no. 14 at 9. He also argues that his use of the funds was a valid exercise of his power as ambas-

lies." Paper no. 7, Appellant's exhibit A (hereinafter "Transcript") at 89–90.

sador. *Id.* at 10. Uwimana argues that the bankruptcy court made two clearly erroneous factual errors. The court found that "there was $17,475 in 'funds remaining' from the $55,000 that Uwimana had transferred to Johnson," and that "Uwimana had not accounted for the government of Rwanda's funds...." *Id.* at 10. Finally, Uwimana argues that he was "blindsided" because Judge Mannes determined that he mishandled the funds after the transfer to Johnson, while Rwanda's complaint focused instead on the initial transfer of the $55,000 as the basis for the defalcation.[4]

As a preliminary matter, Appellant moves to strike from the record four documents not admitted into evidence at trial but that Appellee requests this court to consider on appeal. Paper no. 16. Appellee filed an opposition motion. Paper no. 19. The court finds that it need not consider two of the documents to review this case.[5] For reasons explained later, the court will deny the motion with respect to the U.S. Department of State's Human Rights Report. It will grant the motion with respect to the trust fund accounting maintained by Uwimana's counsel, Robert Johnson.

## II. Standard of Review

The district court sits as an appellate court when reviewing a bankruptcy court's decision. *Berman v. Forti,* 232 B.R. 653, 655 (D.Md.1999). The district court reviews questions of law de novo, but may set aside factual findings only if they are clearly erroneous. *Id.* (citations omitted).

## III. Analysis

The parties appear to accept Judge Mannes' finding that Uwimana was a fiduciary at the time the $55,000 was transferred to Mr. Johnson.[6] Rwanda contends that the bankruptcy court erred, however, in finding that transfer not to be a "defalcation." Uwimana, in turn, contends that the court erred in finding that the later failure to return $17,475 was a defalcation, arguing that he lacked a fair opportunity to prove that the money had all been spent by the time of the demand for its return. He does not, however, seem to contest the finding that he was still a fiduciary at that time because he exercised continuing control over the funds.

Whether a fiduciary capacity exists is a question of federal law. However, many courts have looked to state law to address the issue. *In re Heilman,* 241 B.R. 137, 156 (Bankr.D.Md.1999). Although not pertinent to its ruling, this

---

**4.** The court rejects this argument. As explained later Judge Mannes rendered a partial discharge based on the evidence presented at trial, and Uwimana has pointed to no authority precluding him from doing so.

**5.** The court need not consider counsel for Appellant's declaration regarding his diligence with respect to the $1.9 million dischargeability claim. That claim is not before this court on appeal. Further, this court need not consider Uwimana's declaration regarding his diplomatic career to review this case.

**6.** Judge Mannes found that as ambassador, Uwimana was "charged with management" of Rwanda's funds. Ruling at 7. Judge Mannes determined that the law is silent as to whether this charge made Uwimana a fiduciary for purposes of 11 U.S.C. 523(a)(4). *Id.* ("One cannot even find even the suggestion in the legal encyclopedia as to the answer.").

Nevertheless, the bankruptcy court found that "the ambassadorial office creates a pre-existing trust as mandated as a prerequisite for liability under [§ 523(a)(4) ]." *Id.* This court's independent research on the issue has revealed no case on point concerning whether an ambassador serves in a fiduciary capacity for purposes of liability under § 523(a)(4). Nevertheless, this court finds that for purposes of § 523(a)(4) he in fact did serve in such a capacity. *Compare In re Hayes,* 183 F.3d 162, 168 (2d Cir.1999) (attorney-client relationship falls within defalcation exception as attorneys must maintain confidentiality, avoid conflicts of interest and safeguard client's property) *with* Transcript at 16, 61 (ambassador occupies one of the country's highest positions of trust and duties include managing the country's funds and guarding its secrets).

court finds that the bankruptcy court was correct in concluding that Uwimana was still a fiduciary with respect to those funds belonging to Rwanda that he had in his possession or control after he left office on July 22, 1994. *See e.g., Unnamed Attorney v. Attorney Grievance Commission of Maryland,* 349 Md. 391, 409 708 A.2d 667, 676 n. 10 (1998) (explaining that under the state rules of professional responsibility, attorneys who have been terminated maintain the duty to return any files to the client still in the attorney's possession that rightly belong to the client). Thus, the issue before this court is whether, as a fiduciary, during his tenure as ambassador or after, Uwimana committed defalcation.

■ "A defalcation under § 523(a)(4) is a 'misappropriation of trust funds or money held in any fiduciary capacity; [or the] failure to properly account for such funds.'" *In re Ansari,* 113 F.3d 17, 20 (4th Cir.1997) (quoting *In re Niles,* 106 F.3d 1456, 1460 (9th Cir.1997)). "[A] defalcation for purposes of the statute does not have to rise to the level of 'fraud,' 'embezzlement' or even 'misappropriation.'" *Id.* (citations omitted).

Appellants argue that Uwimana committed a defalcation when he transferred the $55,000 to Johnson in the first instance. Judge Mannes, however, held that Uwimana, in his capacity as ambassador, transferred the $55,000 for legitimate government functions, i.e., to seek asylum for himself and other diplomats at the embassy. Ruling at 7–9. Moreover, Judge Mannes found that $25,000 of the total was "payment to Johnson for what turned out to be 10 to 20 hours service in shutting down the Embassy." *Id.* at 10. This court affirms Judge Mannes' ruling with respect to the $25,000.

**A. The bankruptcy court correctly determined that Johnson's $25,000 fee was beyond its province.**

■ It is undisputed that the Note Verbale ordered Uwimana to leave the country by July 22 and ordered that the embassy cease operations. Judge Mannes found that as ambassador, Uwimana had authority to contract with Johnson to help in his efforts to wind up embassy business. *See* Ruling at 9–10 (explaining that Uwimana ordered the $55,000 check issued at the very last minute that he had authority to do so, and that $25,000 of that amount was for shutting down the embassy). This court agrees with Judge Mannes' legal conclusion that as ambassador, Uwimana had authority on July 22, 1994 to contract with Johnson for legal services to assist with winding down the embassy business. *See* Eileen Denza, Diplomatic Law, A Commentary on the Vienna Convention on Diplomatic Relations 250–51 (2d ed.1998) (explaining that an ambassador may enter into "ordinary contracts incidental to life in the receiving State, such as purchas[ing] ... legal ... services" without being subject to civil suits related to those contracts); *see also Tabion v. Mufti,* 73 F.3d 535, 537 (4th Cir.1996) (explaining that under the Vienna Convention an ambassador is immune from most civil suits unless such suits relate to "commercial activity" performed outside of his official functions, and defining commercial activity as "trade or business activity engaged in for personal profit").

Appellants assert that the bankruptcy court incorrectly held that the $25,000 was outside of its province as this amount was used to aid Uwimana with his asylum matters. Paper 8 at 25. However, the record supports Judge Mannes' factual finding that the $25,000 was to pay Johnson for 10 to 20 hours of work concerning shutting down the embassy.[7] Ruling at 10; Paper

---

7. Appellants point out that the Note Verbale gave Karani until August 14 to wind up embassy business and therefore there was no need for Uwimana to perform this function. Paper no. 8 at 18 n. 22. However, just because the U.S. state department allowed Karani additional time beyond Uwimana's mandated departure date to wind up the embassy does not mean that Uwimana lacked authority

no. 7, Appellant's exhibit C2 at 2 (Johnson's July 21 letter to Uwimana explaining some of the projects to be performed by Johnson); Appellant's exhibit C4 (letter from Karani to Johnson referring to the $30,000 and not the $25,000 as "legal fees related to the immigration business. . . ."); Transcript at 114–15 (Uwimana explaining that the $55,000, among other things, was to be used for asylum and "for helping the embassy"); id. at 137 (Johnson describing some of "winding down" duties he was to perform in the wake of the Note Verbale, which included ensuring embassy bank accounts would not be frozen, paying off embassy debts, and taking care of housekeeping matters).[8] There is no evidence that Uwimana personally benefitted or profited from these particular funds. To the contrary, there was ample evidence presented at trial to support Judge Mannes' conclusion that the money went to Johnson as a legal fee for overseeing various aspects of the imminent embassy shut down. Thus, with respect to the $25,000, this court concludes that the bankruptcy court's findings of facts were not clearly erroneous and that it applied the law correctly.

**B. Uwimana committed a defalcation when he used the $30,000 without the government's permission to finance his and other's asylum requests.**

■ The other $30,000 of the $55,000 was to be used exclusively for immigration matters, and Uwimana's use of the funds for those purposes presents a more difficult legal question. The bankruptcy court determined that Uwimana was justified in using the money to obtain asylum for himself, his family and staff because anyone "confronted with a recall to Rwanda and a charge for high treason, the penalty for this offense being death," would have acted as he did. Ruling at 6.

Obviously, as ambassador, Uwimana had a right to administer the government's funds over which he was entrusted. Rwanda admits as much. See Transcript at 54 (Rwandan Ambassador Mutaboba explaining that one of the duties of an ambassador is to manage the country's funds). The question is whether Uwimana had a right to administer the $30,000 to protect himself and others at the embassy.

The problem with the reasoning of the bankruptcy court on this issue is that the record lacks support for its conclusion that Uwimana used the funds so that he and the other diplomats would not have to return to Rwanda and face death. Uwimana testified that his country was at war and he sought asylum to protect himself and others at the embassy. Aside from this testimony, however, no where in the record is there any clear evidence that had Uwimana returned to Rwanda before he used the funds earmarked for the asylum concerns, he would have faced death.[9] The record instead supports Appellant's argument that Uwimana used the funds for asylum purposes and because he did so, he committed high treason, the punishment for which is death. Ruling at 6; Transcript at 57–58 (Ambassador Mutaboba testifying that use of government funds for purposes of defection is considered high treason); id. at 108 (Uwimana acknowledging that use of the funds was

---

while ambassador to procure legal services to begin the winding up process.

8. Johnson also testified that he only received as a fee $10,000 of the $25,000 to secure immigration attorneys that would help Uwimana and the others with their asylum plans. The other $15,000 was spent "on other aspects of the projects." Transcript at 138–39. Johnson failed to explain at trial on what projects specifically he spent the $15,000.

9. Uwimana testified that had he returned to Rwanda he feared that he would have suffered the same fate as members of his family and his wife's family. He failed to elaborate on exactly what he meant with respect to the fate these other people suffered. Transcript at 107.

considered by Rwanda to be high treason, the penalty for which is death).

Appellee requests that this court take judicial notice of the U.S. Department of State's 1994–1998 Human Rights Reports to support his position that he used the $30,000 and refused to return to Rwanda because he would have faced death. Appellant has moved to strike these documents from the record. Paper no. 19. Although these government reports were not presented as evidence at trial, the court will take judicial notice of the 1994 report. *See Ivezaj v. Immigration and Naturalization Service*, 84 F.3d 215, 218 (6th Cir.1996) (taking judicial notice on appeal of material regarding changed political conditions in Yugoslavia not contained in the record); *Clemmons v. Bohannon*, 956 F.2d 1523, 1532 n. 2 (10th Cir.1992) (Seymour, J., dissenting) (en banc) (taking judicial notice of federal government reports on appeal although the reports were not part of the record); *see also Pueblo of Sandia v. United States*, 50 F.3d 856, 861 n. 6 (10th Cir.1995) (taking judicial notice of letters on appeal not contained in record and citing with approval Judge Seymour's opinion in *Clemmons* for support).

Upon the death of the Rwandan president in April 1994, the country was marked by widespread torture and political and ethnic killings by members of his party. U.S. Department of State Human Rights Report on Rwanda, 1994, at 1. Uwimana apparently served as ambassador under this government, and the barbaric acts described in the state department's reports are likely what led the department to issue the Note Verbale. According to the report, the RPF, which took over in July 1994, called for "national reconciliation" and agreed to work peacefully with the United Nations. *Id.* at 1–2. The report does indicate, however, that some supporters of the RPF participated in ex-

trajudicial killings. *Id.* at 3. However, the report also states that "[t]here is no evidence that the new Government condoned or sanctioned these acts." *Id.* Nevertheless, the president under which Uwimana served was killed under "suspicious circumstances." *Id.* at 1. Uwimana himself was a political leader of a government that was overthrown by a party whose members had suffered mass killings under the former regime. Thus, it is not unreasonable to conclude that Uwimana may have had cause to fear for his life had he returned to Rwanda.[10]

As noted previously, an ambassador has authority to administer the funds of his or her country. However, just because an ambassador possesses authority does not mean that every exercise of that authority is valid. *First Fidelity Bank v. Government of Antigua & Barbuda*, 877 F.2d 189, 192 (2d Cir.1989). In *First Fidelity*, the Second Circuit addressed the issue of whether Antigua was bound by the actions of its ambassador, which included borrowing $250,000 to build a casino, and after failing to repay the loan, entering into a consent order on the country's behalf. The court determined that "an ambassador's actions under color of authority do not, as a matter of law, automatically bind the state that he represents. The facts of a given case must be examined, and the agency law of developed states ... provides the proper framework for that examination." *Id.* at 193. Thus, this court will turn to Maryland law to determine whether, assuming he feared for his life, Uwimana breached his fiduciary duty and committed a defalcation when he used the $30,000 for asylum purposes.

Under Maryland law, "[a]n agent has a duty to his principal to act solely for the benefit of the principal in all matters connected with his agency." *Green v. H & R Block, Inc.*, 355 Md. 488,

---

**10.** The court rejects Uwimana's argument that Rwanda should be precluded from recovery because of unclean hands. The state department report clearly states that there is no proof the RPF sanctioned extrajudicial killings.

517, 735 A.2d 1039, 1055 (1999). It is inherent in the principal-agent relationship that the agent must avoid any conflict of interest between his or her own interest and that of the principal. *Id.* (citation omitted). Moreover, the agent must not "permit himself to be placed in a position where his own interest or those of any other person whom he has undertaken to represent may conflict with the interests of his principal." *Id.* at 518, 517, 735 A.2d at 1056 (citation omitted). An agent breaches his or her fiduciary duty when he or she fails to disclose to the principal any information the latter reasonably may want to know; this is especially true in situations involving conflicts of interest. *Id.* (citation omitted). "If the agent is to receive any benefit from a transaction in which he is serving his principal, the agent must fully disclose any interest he has in the transaction and receive the consent of his principal to proceed, even if the principal ultimately was to benefit from the transaction." *Id.* at 519–20, 735 A.2d at 1056 (quoting *Gussin v. Shockey,* 725 F.Supp. 271, 275 (D.Md.1989), aff'd, 933 F.2d 1001, 1991 WL 82059 (4th Cir.1991)).

The bankruptcy court rejected Uwimana's testimony that he had been authorized to enter into the July 21 agreement by his country's prime minister. Transcript at 84; Ruling at 7–8. The court found that Uwimana's decision was his own, and that as ambassador he had authority to administer the entire $55,000.

Appellant's argument that Uwimana committed a defalcation at the moment he transferred the funds, at least with respect to the $30,000, has merit. Uwimana acted without the authority of the new government in diverting the funds for his and other's asylum. Admittedly, this case is difficult because Uwimana presumably lacked funds outside of the embassy's

funds to finance the asylum requests. Yet, had he gone back to his country he may have faced death. Moreover, there is no evidence that he pocketed the money, but rather the record is clear that he used the funds to seek asylum for himself, his family and others at the embassy. Finally, as Judge Mannes observed, this case would not be before this court had the government under which Uwimana served remained in power. His use of the funds or his authority to use them would not be at issue. Ruling at 6.

Nevertheless, obtaining asylum certainly was a benefit to Uwimana and others who were then under his charge. Further, as Appellants point out, there is no " 'fear of life' exception" under the defalcation provision of the bankruptcy code. At the moment he authorized the transfer of the funds, Uwimana knew the government had changed hands. Ruling at 8. Moreover, it is doubtful that he failed to realize that had he sought the new government's permission to use government funds for the asylum requests, such permission would have been denied. Transcript at 35–36 (Ambassador Mutaboba explaining that Rwanda would never allow anyone including an ambassador to use public funds to finance his or her own "personal defection.").[11] Uwimana breached his fiduciary duty by using the funds without the authority of and in conflict with the interests of Rwanda. Thus, this court holds that at the moment of the transfer Uwimana committed defalcation with respect to the $30,000. *See Ansari,* 113 F.3d at 20 (defalcation is misappropriation of trust funds or money held in any fiduciary capacity).[12]

## C. Karani's letter ratified Uwimana's use of the funds.

 Even if Uwimana lacked authority to transfer the $30,000, the bank-

---

11. The bankruptcy court allowed Mutaboba to testify in his capacity as ambassador, similar to an official testifying on behalf of a government agency, pursuant to Fed.R.Civ.P. 30(b)(6). Transcript at 35.

12. This holding differs from the bankruptcy court's. Judge Mannes held that Uwimana remained a fiduciary after leaving office on July 22 and committed defalcation when he failed to return $17,475 of the $30,000 as Karani directed him to do in the September 6 letter. Ruling at 12.

ruptcy court correctly held that under agency principles Karani's letter ratified the use of the funds. *See* Restatement (Second) of Agency § 82 (1958) ("Ratification is the affirmance by a person of a prior act which did not bind him but which was done ... on his account, whereby the act ... is given effect as if originally authorized by him."); *see also id.* at § 83 (describing affirmance as "a manifestation of an election by one on whose account an unauthorized act has been done to treat the act as authorized...."). Ratification is only applicable where the original agent, in this case Uwimina, was without actual or apparent authority to bind the principal in the first instance. *Integrated Consulting Serv. v. LDDS Communications, Inc.*, 176 F.3d 475, 1999 WL 218740 at \*6 (4th Cir.1999) (citing *Citizens Bank of Maryland v. Maryland Indus. Finishing Co.*, 338 Md. 448, 659 A.2d 313, 320 n. 9 (1995)). Thus, any argument of ratification must serve as an alternative to that of Uwimana possessing authority to administer either the $25,000 and/or the $30,000. Ratification provides that a contract made by an agent without authority may, by words, conduct or silence subsequently be approved by the principal. *See Bruffey Contracting Co., Inc. v. Burroughs*, 522 F.Supp. 769, 774 (D.Md.1981), *aff'd*, 681 F.2d 812 (4th Cir.1982). The principal must also manifest an intent to ratify the transaction, and can do so by action or silence. *LDDS*, 176 F.3d 475, 1999 WL 218740 at \*6.

The bankruptcy court found that as Rwanda's charge d' affaires, Karani had authority to ratify Uwimana's use of the $55,000. Ruling at 9–11 (explaining that charge d'affaires "requires accreditation by one country to the foreign ministry of another."). As explained previously, this court finds that Uwimana had authority to pay for legal services with respect to the embassy shut down. However, the $30,000 is a different matter.

Until this appeal, the parties did not appear to dispute that Karani, as charge d' affaires, had authority to write the September 6 letter or to bind Rwanda. Thus, Judge Mannes relied, appropriately, on Karani's letter to find that he had legitimatized the transfer of the $30,000 and put the $25,000 beyond the reach of the court. Karani knew that the total amount involved was $55,000, as he signed the check issued to Johnson. Yet, he failed altogether to mention the $25,000 fee in his September 6 letter, and focused instead on the $30,000 allotted for immigration purposes. Karani's letter does not state that the original transfer of the $30,000 was unauthorized, neither does it demand return of all the money.

Appellant does not appear to argue that Rwanda was unaware of Karani's September 6 letter. It instead argues that Karani, as Uwimana's "co-conspirator," could not ratify the latter's use of the funds for the immigration matters. Nowhere in the record does the Rwandan government allege that Karani acted improperly with respect to the September 6 letter.[13] After Uwimana's departure, Karani was left in charge of winding up the embassy business. Further, as noted above he found his way back into the good graces of the Rwandan government and no longer needed to utilize the portion of the $30,000 that was set aside to help him obtain asylum in the United States. Ambassador Mutaboba testified that when he arrived at the embassy in September, he worked with Karani and another diplomat for five months on

---

13. Ambassador Mutaboba testified that Rwanda would never allow use of government funds to finance one's defection. Transcript at 34–35. The ambassador arrived at the embassy sometime in September, the same month that Karani sent the letter to Johnson. Mutaboba testified that he was aware of the September 6 letter, yet he failed to disavow it. *Id.* at 38. Moreover, he took office as ambassador on September 21 but claims that he had "read the letters before, long before." *Id.* at 48. Ambassador Mutaboba did, however, send a letter to Johnson on November 14, requesting the entire $55,000. Paper no. 7, Appellant's exhibit C8.

embassy matters. Transcript at 37. Appellant cannot now be heard to argue that Karani acted improperly or without the government's knowledge in writing the September 6 letter. *Cf. Integrated Consulting,* 176 F.3d 475, 1999 WL 218740 at *6–7 (explaining that a communications company could not ratify a contract purportedly entered into on its behalf by an independent contractor who was without authority to do so when, among other things, evidence showed that the company was unaware of the agreement during the time that ratification could have taken place). Thus, the bankruptcy court correctly concluded that Karani's letter ratified Uwimana's use of the $30,000.[14]

### D. Judge Mannes' finding that $17,475 was non-dischargeable debt was not clearly erroneous.

The court rejects Appellee's argument that the bankruptcy court had no basis for finding that $17,475 was non-dischargeable debt. Judge Mannes again relied on Karani's letter in reaching his conclusion. That letter clearly shows that Karani subtracted from the $30,000 the $10,760 used for Uwimana and his family's immigration, and $1,765 for medical expenses also related to immigration matters, leaving $17,475 as non-dischargeable debt. Transcript at 38 (showing that the September 6, letter from Karani was admitted into evidence). Whether in fact Uwimana had the $17,475 in hand or in the trust account at the time Johnson received Karani's letter is irrelevant. Uwimana had no authority to transfer the $30,000 in the first place, and he committed a defalcation upon doing so. As explained above, Karani's letter ratified Uwimana's use of the funds for the immigration matters. Consequently, Judge Mannes correctly found that of the $30,000, Uwimana properly allocated all but $17,475, and that he owed that amount to the Rwandan government.

Moreover, Judge Mannes was not clearly erroneous in determining that the only

numbers before him with respect to the handling of the $30,000 were those found in Karani's letter. Uwimana asks this court to consider Johnson's trust fund accounting of the $55,000, submitted as a pretrial exhibit by Rwanda. That document was neither entered into evidence nor presented to the bankruptcy court for its consideration. Thus, this court will not consider it on appeal. *See* 16A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 3956.1 (3d ed.1999) (explaining that only matters presented to the trial court are considered part of the record on appeal, excluding "matters ... merely lodged with the clerk or never offered into evidence"). Consequently, this court finds that based on the documents presented to the bankruptcy court, Karani's letter, Judge Mannes correctly determined that Uwimana has failed to account for $17,475 of Rwanda's funds.

### IV. Conclusion

For the foregoing reasons, the court shall AFFIRM the Order of the bankruptcy court.

A separate Order will be entered.

---

**14.** While Karani's letter ratified Uwimana's use of the $30,000, it did so for purposes of the immigration requests. Thus, to the extent any portion of the $30,000 was not spent for those purposes, those funds are owed to Rwanda.