274 F.3d 806 (4th Cir. 2001)
 In Re: Aloys Uwimana and Emma D. Uwimana, Debtors.
Republic Of Rwanda, Plaintiff-Appellee,
v.
Aloys Uwimana; Emma D. Uwimana, Debtors-Appellants.
In Re Aloys Uwimana; and Emma D. Uwimana, Debtors.
Republic of Rwanda, Plaintiff Appellant,
v.
Aloys Uwimana; Emma D. Uwimana, Debtors-Appellees.
 No. 01-1021, No. 01-1022
 UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
 Argued: October 29, 2001
Decided: December 14, 2001
 
 Appeals from the United States District Court for the District of Maryland, at Greenbelt. Deborah K. Chasanow, District Judge. (CA-00-763-DKC, BK-98-22039-PM, AP-98-1688)[Copyrighted Material Omitted]
 COUNSEL ARGUED: Christopher S. Moffitt, Alexandria, Virginia, for Appellants. David J. Farber, PATTON BOGGS, L.L.P., Washington, D.C., for Appellee. ON BRIEF: Harold H. Kim, Lisa M. Dwyer, PATTON BOGGS, L.L.P., Washington, D.C., for Appellee.
 Before WIDENER, NIEMEYER, and MOTZ, Circuit Judges.
 OPINION
 DIANA GRIBBON MOTZ, Circuit Judge:
 
 
 1
 This appeal stems from a Chapter 7 petition for bankruptcy relief, filed by the former Rwandan Ambassador to the United States, Aloys Uwimana, and his wife, Emma D. Uwimana. The Republic of Rwanda initiated an adversary proceeding in that case in which it alleged that Aloys Uwimana owed it a nondischargeable debt arising from "defalcation" while acting in his fiduciary capacity as ambassador. See 11 U.S.C. S 523(a)(4) (1993). The bankruptcy court held that Uwimana had committed a defalcation and so owed Rwanda a nondischargeable debt of $17,475. The district court affirmed this holding, see Republic of Rwanda v. Uwimana, 255 B.R. 669 (D. Md. 2000), and the Uwimanas appeal, contending that: (1) Rwanda cannot maintain a claim to a nondischargeable debt because of its own "unclean hands"; (2) Aloys Uwimana did not breach his fiduciary duty to Rwanda; (3) judgment should not have been entered against Emma Uwimana, whom Rwanda never sued. Rwanda cross-appeals, asserting that the amount of Uwimana's nondischargeable debt is actually $55,000. For the reasons that follow, we affirm the district court's judgment as to Aloys Uwimana but vacate its judgment as to Emma Uwimana.
 
 I.
 
 2
 Aloys Uwimana served as Rwandan Ambassador to the United States from October 1, 1987 until July 22, 1994. Toward the end of his tenure, in April 1994, a plane carrying the Presidents of Rwanda and Burundi was shot down and a bloody civil war began. By July 4, 1994, elements of the Rwandan Patriotic Front (RPF) had captured the Rwandan capital. In America, Uwimana opposed the RPF. On July 8, 1994, he contracted with Washington, D.C. attorney Robert W. Johnson for lobbying services, asking Johnson to help "isolat[e] . . . the RPF" and "[o]btain the support of American authorities to a political solution of the Rwandan conflict." JA 264. Uwimana paid Johnson $28,000 from the embassy's accounts on July 13, and promised to pay another $42,000 over the next several months if Johnson's work was satisfactory.
 
 
 3
 Events soon outpaced Uwimana's plan. On July 15, the United States State Department ordered the Rwandan embassy closed by July 22. The State Department also ordered Uwimana, his family, and others at the embassy to leave the country by that date. Only one diplomat, Boniface Karani, was permitted to remain "for the present to oversee closing of the embassy, the departure of all other Embassy personnel, and the disposition of all property." On July 19, the RPF swore in its leaders as the new government of Rwanda.
 
 
 4
 Two days later, on July 21, Johnson sent Uwimana a letter proposing a new set of projects. Johnson requested $25,000 to fund: (1) "oversight and assistance with respect to . . . asylum requests"; (2) outreach to the United States government "when the Embassy's bank accounts are eventually frozen or otherwise restricted"; and (3) "transition" support for embassy personnel. The letter also informed Uwimana that Johnson was in touch with two attorneys, identified as Mr. Rubin and Ms. Drew, who would handle asylum requests for the families of three embassy diplomats: Uwimana, Karani, and Jean-Baptiste Rwakazina. Rubin and Drew demanded part payment before they would begin work and estimated that representation could cost as much as $30,000 "[i]f the cases [we]re contested." On July 22, Uwimana's last day as ambassador, he arranged for the transfer of $55,000 from the embassy's account to Johnson. Pursuant to embassy policy, Karani and Rwakazina cosigned the check.
 
 
 5
 Uwimana and his family subsequently won asylum, and remain in the United States. Neither the Karani nor Rwakazina families sought or obtained asylum, however. In fact, Karani found favor with the new government and was retained as charge d'affaires of the embassy. As Rwanda did not appoint a new ambassador, this made Karani the ranking embassy official. On September 6, Karani wrote a letter to Johnson on embassy stationery, in his official capacity, which stated in full:
 
 
 6
 I am writing to confirm the termination of the project Projects [sic] for the Embassy as for [sic] our discussions of September 6, 1994.
 
 
 7
 By that decision a refund is requested for legal fees related to the immigration business since necessary steps have been taken for only one diplomat family.
 
 
 8
 Therefore the requested amount is $30,000 less $10,760 legal fees estimated for the said diplomat family and less $1,765 refund to another diplomat for medical expenses related to TPS application.
 
 
 9
 The check to be paid to the Embassy will be of $30,000 $10,760 $1,765 = $17,475.
 
 
 10
 I take this opportunity to renew to you the expension [sic] of my high consideration.
 
 
 11
 Johnson did not send the refund. Instead, on September 15, he sent to Karani, at the proper embassy address, written notification that in Uwimana's view the new Rwandan government could not compel return of any portion of the $55,000 transfer. For some weeks, neither Karani nor any other Rwandan official protested or even responded. Finally, on November 22, a new Rwandan charge d'affaires, Joseph W. Mutaboba, who assumed office on September 21 and became Karani's superior, sent Johnson a letter requesting return of the entire $55,000 transferred to Johnson on July 22. Johnson and Uwimana again refused to return any funds.
 
 
 12
 On July 7, 1997, the Republic of Rwanda sued Aloys Uwimana, Johnson, and others for conversion and breach of fiduciary duty to recover, inter alia, the $55,000 Uwimana transferred to Johnson. See Government of Rwanda v. Rwanda Working Group, 150 F. Supp. 2d 1, 4 (D.D.C. 2001). On September 11, 1998, Aloys Uwimana filed a Chapter 7 bankruptcy case in the District of Maryland. Three months later the Republic commenced this adversary proceeding in that bankruptcy case, seeking a determination that Aloys Uwimana's $55,000 transfer was a nondischargeable debt because it resulted from his defalcation while acting as a fiduciary for the Republic of Rwanda.
 
 
 13
 The bankruptcy court found that the $55,000 transfer was within the scope of Uwimana's authority as ambassador, but that he committed defalcation when he refused, without justification, to tender back $17,475 after receiving the September 6 letter. Accordingly, the court held that this latter amount constituted a nondischargeable debt. The district court affirmed on other grounds. It found that Uwimana had had authority to transfer only the $25,000 paid to Johnson, and that the remaining $30,000 paid to Drew and Rubin for asylum efforts was a defalcation. The court also found, however, that Rwanda had ratified all but $17,475 of Uwimana's defalcation in the September 6 letter. The district court therefore concluded that Aloys and Emma Uwimana owed a nondischargeable debt to the Republic of Rwanda in the amount of $17,475.
 
 
 14
 The Uwimanas appeal, asserting that the unclean hands doctrine bars Rwanda's claim, that Aloys Uwimana never breached his fiduciary duty, and that in any event, Emma Uwimana owed no such debt. Rwanda cross-appeals, claiming that Aloys Uwimana owes a nondischargeable debt in the amount of $55,000. We first address the Uwimanas' affirmative defense, then the question of Aloys Uwimana's defalcation, and finally the judgment against Emma Uwimana.
 
 II.
 
 15
 The Uwimanas note that the equitable powers of bankruptcy courts are "available only to . . . creditors with `clean hands,'" Carolin Corp. v. Miller, 886 F.2d 693, 698 (4th Cir. 1989) (citation omitted). A plaintiff with "unclean hands" is "not entitled to relief from a court of equity in the form of an order denying the dischargeability of debt." Hutchinson v. Bromley, 126 B.R. 220, 223 (Bankr. D. Md. 1991). The Uwimanas argue that Rwanda has unclean hands because it seeks to "persecute" Aloys Uwimana for his political beliefs, and they accuse Rwanda of an "unholy quest" to undermine their finances and reputation.
 
 
 16
 Even if these assertions could be proven, they would not bar Rwanda from relief in this action. A court can deny relief under the doctrine of unclean hands only when there is a close nexus between a party's unethical conduct and the transactions on which that party seeks relief. See Keystone Driller Co. v. General Excavator Co., 290 U.S. 240, 245 (1933) (predicate act underlying an unclean hands defense must have an "immediate and necessary relation to the equity that [one] seeks in respect of the matter in litigation"); Wetzler v. Cantor, 202 B.R. 573 (D. Md. 1996) (noting that even truthful allegations of self-dealing did not warrant application of "unclean hands" doctrine if the self-dealing was not "connected with the transaction upon which the claimaint s[ought] relief") (citation omitted). We are not open to arguments about a party's general moral fitness, but only apply the unclean hands doctrine to prevent a party from using the courts to reap the benefits of wrongdoing.
 
 
 17
 In this case, the Uwimanas have produced no evidence that Rwanda was responsible for Aloys Uwimana's decision to spend embassy funds, either by threatening or misleading him. During the bankruptcy hearing Aloys Uwimana did state that if he returned to Rwanda he and his family might face a terrible "fate." But he has never claimed that he sought asylum to avoid punishment by Rwanda.[1] Indeed, Aloys Uwimana asked the district court to take judicial notice of the 1994 State Department Human Rights Report on Rwanda, which concluded that the government of the country did not sanction extra-judicial killings. See Republic of Rwanda, 255 B.R. at 677 n.10. At most we can conclude, as the district court did, that Aloys Uwimana was afraid to return to Rwanda because of the general unrest there. Id. at 677. Although we do not minimize this fear, we cannot attribute it to the Republic of Rwanda for purposes of the unclean hands doctrine.
 
 
 18
 Nor does the fact that the United States granted the Uwimanas' request for asylum strengthen their argument. Under 8 U.S.C.A. S 1158(b) (West 1999) and S 1101(a)(42)(A) (West 1999), asylum is available to persons with a well-founded fear of persecution by governmental or non-governmental forces. The Uwimanas have presented no evidence to establish when their fear of persecution materialized or what its source may have been. They may have been in danger only after and because of Aloys' decision to use Rwandan funds to seek asylum. Or, the danger may have come from vigilante groups rather than the government. Accordingly, the doctrine of unclean hands does not bar Rwanda's claim.
 
 III.
 
 19
 We turn next to the question of defalcation. Defalcation is "the failure to meet an obligation" or "a nonfraudulent default." Black's Law Dictionary 427 (7th ed. 1999). To be defalcation for purposes of 11 U.S.C. S 523(a)(4), an act need not "rise to the level of . . . `embezzlement' or even `misappropriation.'" Pahlavi v. Ansari (In re Ansari), 113 F.3d 17, 20 (4th Cir. 1997) (citations omitted). Thus, negligence or even an innocent mistake which results in misappropriation or failure to account is sufficient.
 
 
 20
 Although apparently no case so holds, we agree with the district court that ambassadors are, by definition, fiduciaries for the country they represent. Thus, Aloys Uwimana served as a fiduciary for the Republic of Rwanda while serving as its ambassador to the United States. When Rwanda appointed Uwimana its ambassador, the Republic entrusted him with state secrets and financial assets, and undoubtedly expected his undivided loyalty and faithful service. We cannot conceive of any theory that would relieve an ambassador, so entrusted, from fiduciary responsibility, and the Uwimanas do not propose one.
 
 
 21
 Instead they maintain that Aloys Uwimana never breached his fiduciary duty to Rwanda because his $55,000 transfer was within the scope of his discretion as ambassador. They rely on the Vienna Convention, which explains that the duties of an ambassador include, among other things, "protecting . . . the interests of the sending state and its nationals." Vienna Convention on Diplomatic Relations, Apr. 18, 1971, Art. 3, 23 U.S.T. 3227, 3232. See also Marcellus Donald A.R. von Redlich, The Law of Nations, at S 86 (2d ed. 1937) (noting ambassadors may act to promote the private interests of their country's nationals). Here, the Uwimanas contend, they and the other diplomat families had been endangered by the threat of deportation and Aloys acted to assist them.
 
 
 22
 But of course, Aloys Uwimana's discretion as an ambassador arose within the context of a principal-agent relationship. The purpose of the privileges protected by the Vienna Convention, upon which the Uwimanas so heavily rely, was "not to benefit individuals but to ensure the efficient performance of the functions of diplomatic missions as representing States." Vienna Convention, Preamble, 23 U.S.T. 3227, 3230 (emphasis added). In other words, the Convention rests on the presumption that an ambassador exercises delegated discretion to further the interest of the state. And, under basic principles of agency law, Aloys Uwimana plainly breached his duty to Rwanda.[2] An agent must avoid conflicts of interests with his or her principal, and "[i]f the agent is to receive any benefit from a transaction in which he is serving his principal, the agent must fully disclose any interest he has in the transaction and receive the consent of his principal to proceed, even if the principal ultimately was to benefit from the transaction." Gussin v. Shockey, 725 F. Supp. 271, 275 (D. Md. 1989) (citations omitted), aff'd, 933 F.2d 1001 (4th Cir. 1991).
 
 
 23
 In this case, Aloys Uwimana used at least some of the funds belonging to the Republic of Rwanda to purchase a substantial benefit -preparation of a case for asylum -for himself and his family, without disclosing his act to the government of the state he represented or seeking its consent. This was defalcation.[3]
 
 
 24
 Questions remain, however, about how much of the $55,000 was used for proper asylum purposes and how much for proper expenditures benefitting the Republic of Rwanda (e.g. "transition matters"), and whether Rwanda later ratified any part of the $55,000 transfer. Because we conclude that Rwanda ratified all but $17,475 of the transfer, we need not reach the initial question of exactly how much of the $55,000 was originally intended for improper asylum purposes.
 
 
 25
 Under the doctrine of ratification, a principal may later approve the actions of an agent who acted without authority. See e.g., Bruffey Contracting Co., Inc. v. Burroughs Corp., 522 F. Supp. 769, 774 (D. Md. 1981), aff'd, 681 F.2d 812 (4th Cir. 1982). An "[i]ntention to ratify may be inferred by words, conduct or silence on the part of the principal that reasonably indicates its desire to affirm the unauthorized act." Progressive Cas. Ins. Co. v. Ehrhardt, 518 A.2d 151, 156 (Md. Ct. Spec. App. 1986). See generally Restatement (Second) of Agency S 93 (1958); 3 Am. Jur. 2d, Agency S 182, at 683-84 (2d ed. 1986).
 
 
 26
 In this case, the charge d'affaires at the Rwandan embassy, the ranking officer at the embassy, wrote Johnson and Uwimana "to confirm the termination" of Aloys Uwimana's embassy projects. In his letter, the charge d'affaires requested a partial refund of "legal fees related to the immigration business since necessary steps have been taken for only one diplomat family." The letter did not seek repayment of any part of the $25,000 earmarked for Johnson, even though it stated that Rwanda was closing out Aloys Uwimana's "[p]rojects for the Embassy." (emphasis added). Nor did the letter accuse Uwimana of wrongdoing or ask him to repay funds used to obtain asylum for his family. It asked him to return only the unspent portion of the $30,000 earmarked for asylum applications, because the Karanis and Rwakazinas no longer sought asylum. On this basis, the charge d'affaires determined that the amount of the refund was $17,475. This constituted a partial ratification, issued by a properly credentialed representative of the Rwandan government in the United States, whom the Bankruptcy Court expressly found to be acting in his "official capacity."
 
 
 27
 Rwanda now claims that the charge d'affaires' ratification was ultra vires and so ineffective. We are not persuaded. Rwanda does not claim that it was unaware of the letter. Despite its knowledge, Rwanda did not seek to retract or qualify the letter for more than two months. Indeed, the Rwandan government retained Karani in a position of responsibility at its embassy in Washington until at least February 1995 -long after his assertedly unlawful September 1994 letter had been discovered.[4] Even at the hearing before bankruptcy court, no Rwandan official criticized Karani's performance or asserted that the September letter had exceeded his authority. Rwanda's second thoughts now, during litigation, come too late.
 
 
 28
 In sum, Rwanda partially ratified Aloys Uwimana's acts: it forgave the $25,000 paid directly to Johnson and all but $17,475 of the remaining $30,000. The bankruptcy court found as a fact that the $30,000 payment was originally "earmarked" for improper asylum purposes, and nothing suggests that this finding is clearly erroneous. Accordingly, we affirm the judgment of the district court that Aloys Uwimana owes the Republic of Rwanda a nondischargeable debt in the amount of $17,475.
 
 IV.
 
 29
 Finally, we consider the question of the judgment entered against Emma Uwimana. The Republic of Rwanda has never maintained that Emma Uwimana owed it a nondischargeable debt. Rwanda did not (1) name her as a defendant in its complaint, (2) serve her with process, or (3) make any allegations concerning her. In its appellate brief, Rwanda concedes that the district court's judgment should not "apply to" Emma Uwimana. Brief of Appellee at 22 n.8. Accordingly, we vacate the judgment against her.
 
 AFFIRMED IN PART AND VACATED IN PART
 
 
 Notes:
 
 
 [1]
 Mutaboba (formerly charge d'affaires and now the Rwandan Ambassador to the United Nations) testified that Aloys Uwimana's defection constituted high treason; Uwimana opined that high treason was punishable by death. But even assuming that Uwimana is correct, any such threat would have arisen as the result of his decision to seek asylum, and could not have been the cause of that decision.
 
 
 [2]
 The Uwimanas did not present either Rwandan law or established embassy practice to support their broad view of ambassadorial discretion. If they had, we would of course have considered that as part of our analysis.
 
 
 [3]
 This holding differs from that of the bankruptcy court, which found no defalcation because Aloys Uwimana faced a charge of "high treason" upon his return to Rwanda and did what "anyone faced with [that] choice" would do. Actually, because there is no record evidence that Aloys Uwimana was chargeable with high treason before he transferred the $55,000, the treason charge would have applied (if at all) only after Uwimana transferred the $55,000. Republic of Rwanda, 255 B.R. at 676. Accordingly, the bankruptcy court's contrary finding of fact constituted clear error.
 
 
 [4]
 The record does not reveal precisely how long Karani continued to work at the Rwandan embassy.