**ESSEX INSURANCE COMPANY,**
Plaintiff,

v.

**Allen HOFFMAN, et al., Defendants.**

No. CIV. A. JFM–99–300.

United States District Court,
D. Maryland.

Oct. 15, 2001.

Scott D. Goetsch, Moore and Jackson LLC, Towson, MD, for Essex Insurance Co.

Michael E. Marr, Baltimore, MD, for Allen Hoffman, T-Up, Inc.

Michael Patrick Smith, Israelson Salsbury Clements and Bekman, Baltimore, MD, for Sue Lowery and Wendy Daley.

David Freishtat, Freishtat & Sandler, Baltimore, MD, Stacie F. Dubnow, Freishtat and Sandler, Baltimore, MD, for Neal Deoul.

## MEMORANDUM

MOTZ, Chief Judge.

Plaintiff Essex Insurance Company seeks summary judgment in a suit alleging that the insurance policy it issued to T–Up Inc. ("T–Up") is void *ab initio* because of misrepresentation. Essex contends that it therefore need not defend T–Up officers in a wrongful death suit involving T–Up's products. Defendants, T–Up and its officers,[1] have filed a cross-motion for summary judgment. Defendants assert that they did not misrepresent T–Up's products and that the Essex policy covered the alleged injuries giving rise to the wrongful death suit and a second suit that later was filed. For the reasons stated below, both Plaintiff's Motion for Summary Judgment

---

1. Defendants' arguments are raised by Neal Deoul, Defendant–Intervenor. Because Defendants Allen Hoffman and T–Up have adopted Deoul's Cross–Motion for Summary Judgment, the Defendants and Defendant–Intervenor are treated collectively as "T–Up."

and Defendant–Intervenor's Cross–Motion for Summary Judgment will be denied.

## I.

Plaintiff Essex Insurance Co. ("Essex") is what is known in the insurance industry as a "surplus lines carrier." It sells insurance that other insurers consider high risk because of the nature of the company or product to be insured. (Dep. William Bradley Dickler at 10); *see also United Capitol Ins. Co. v. Kapiloff,* 155 F.3d 488, 491 (4th Cir.1998) (noting that surplus lines are "substandard risks that standard [insurance] markets generally do not handle"). This case revolves around whether Essex understood the risks when it agreed to underwrite products liability insurance for T–Up, a distributor of "immune enhancers" that later was sued by the families of cancer victims that took T–Up's products.

Officials of T–Up began seeking insurance to cover products liability risks in late 1996. (Mem. of Law in Supp. of Cross–Mot. for Summ. J. ¶ 4.) The Maryland-based T–Up distributed two main products: an aloe vera concentrate called T–Up and capsules of cesium chloride, a mineral. (*Id.* ¶ 2.) The president and vice-president of T–Up, Allen Hoffman and Neal Deoul, met with an insurance agent to discuss obtaining coverage for T–Up's products. (*Id.* ¶ 4.) That agent, William Keenan of Hay & Langrall, later said he understood from the meeting that T–Up distributed naturally occurring "food supplements" and not medicinal products.[2] (Dep. William C. Keenan at 24–25.)

After meeting with T–Up officials, either Keenan or his assistant prepared an insurance application for T–Up on a standard industry "Acord" form. (*Id.* at 39–40.) The form classified T–Up's business as "mail order health foods" and described the nature of its operations as "mail order distribution of aloe vera and cesium chloride, natural substances capable of enhancing and strengthening the human immune system." (*Id.* at 41–44.)

Keenan's initial efforts to secure insurance for T–Up's products were futile, as several insurance companies declined the risk. (*Id.* at 11–12.) Keenan then approached a Maryland surplus lines broker, Horan, Goldman & Co. ("Horan Goldman"). (Mem. of Law in Supp. of Cross–Mot. ¶ 10.) It is not unusual in the insurance industry for one insurance agent to approach another insurance agent or broker in an attempt to secure specialized insurance for a client or to secure insurance after several other insurers have declined to accept that client's account. Horan Goldman, the broker Keenan contacted about T–Up, is the Maryland broker for Essex. (Dep. William Bradley Dickler at 15.)

Keenan supplied Horan Goldman with the Acord form for T–Up, along with

2. Keenan testified in his deposition that if he had believed the products were drugs, he would have sought to insure T–Up as a "mail order drugstore." (Dep. William C. Keenan at 42.) Counsel for Deoul conceded in oral argument, for the purpose of these motions only, that T–Up provided information in its initial meeting with Keenan that was inaccurate, incomplete, or misleading. Subsequently, Hoffman, the president of T–Up, pleaded guilty to two counts of distribution in interstate commerce of an unapproved new drug with intent to defraud the public. The bad faith or fraud of T–Up officials in providing information to Keenan, who acted as T–Up's agent, or in marketing their product to the public is immaterial to deciding these motions. *See, e.g., Fitzgerald v. Franklin Life Ins. Co.,* 465 F.Supp. 527, 534 (treating as the same, in a material misrepresentation case involving insurance, an intentional misrepresentation and a mistaken representation made in good faith). I need not decide now whether Hoffman's statements constitute admissions by Defendants, as Plaintiff argues.

photocopies of product packaging he had collected from T–Up, typed versions of the labels on the bottles,[3] and a general application in which Hoffman, T–Up's president, stated that T–Up sells "neutraceutical products (aloe vera and cesium chloride) for health." [4] (Mem. of Law in Supp. of Cross–Mot. Ex. 30.) Horan Goldman then contacted Essex, which agreed to insure T–Up provided that T–Up obtained a certificate of insurance from the manufacturer of T–Up's products,[5] a standard condition that T–Up satisfied. (Mem. of Law in Supp. of Cross–Mot. ¶ 15, Dep. William C. Keenan at 49.) Horan Goldman subsequently issued a 45–day binder,[6] stating that it had obtained "Products/Completed Operations" coverage for T–Up effective April 1, 1997. (Pl.'s Mot. for Summ. J. Ex. 4.)

The policy Essex wrote covering T–Up was effective for one year, from April 1, 1997 to April 1, 1998. It was a commercial general liability policy providing coverage for bodily injury or property damage claims to which the insurance applied.[7] (Id.) The policy covered several different types of risks T–Up might encounter. In a summary of the policy to Keenan, a Horan Goldman broker described the policy as "General Liability to include Products[,] Personal Injury and Fire . . . ." (Mem. of Law in Supp. of Cross–Mot. Ex. 18.) The policy was later renewed for one year, to April 1, 1999, although the premium basis was reduced from $5 million to $3 million to account for reduced sales of T–Up products.[8] (Pl.'s Mot. for Summ. J. Ex. 4.)

As part of the commercial liability coverage provided by Essex, Horan Goldman ordered, on April 9, 1997, an inspection of T–Up's premises that was designed to detect physical hazards there. (Mem. of Law in Supp. of Cross–Mot. ¶ 20.) The

---

3. The label for the aloe vera concentrate, which is called T–Up, states on the front that it is "Whole Leaf Aloe Vera Concentrate" and "Makes 14 Quarts of 100% Juice / 2 fl. oz." On the back, the directions advise: "Mix one capful with a quart of water or a quart of juice." Ingredients are listed as concentrated aloe juice, preservatives, and stabilizers. The typed version of the label also states: "Whole Leaf–Aloin Free / Immune Enhancer / Sold as a Juice Concentrate ONLY" (emphasis in original) (Mem. of Law in Supp. of Cross–Mot. Ex. 32.)

The cesium chloride label indicates that the bottle contains 100 capsules, each containing 500 mg of cesium chloride. As to suggested use, it states: "Six or more capsules per day or as directed by your physician." (Id. Ex. 33.)

4. All of these items appear in Essex's underwriting file for the T–Up products liability coverage. (Pl.'s Mot. for Summ. J. Ex. 4.)

5. The certificate showed that the manufacturer listed the distributor, T–Up, as an "additional insured" on the manufacturer's insurance policy.

6. A binder provides interim insurance between the application for and provision of insurance. 1 Couch on Insurance § 13.1 (3d ed.1997).

7. Commercial general liability policies covering "products/completed operations" have become common since 1986. " 'Completed operations' provisions refer to bodily injury and property damage which occur away from premises owned or controlled by the insured after the insured has completed work or relinquished custody of its product." 9 Couch on Insurance § 129:14 (3d ed.1997).

8. In the case of both the original policy and the renewal, T–Up paid a premium equivalent to one-tenth of one percent of its estimated sales for the policy period. It paid $5,000 the first year and $3,000 the second year. Essex's vice president described this premium amount as "a very low rate" that was due to what Essex believed was "the innocuous nature of the product. . . ." (Dep. William Bradley Dickler at 44.)

inspection was performed by a company called Regional Underwriters sometime between April 30, 1997, and May 7, 1997. (*Id.* ¶ 25.) Regional Underwriters later filed a report that was found in Horan Goldman's file on T–Up. (*Id.* ¶ 34.) A narrative attached to the report stated that "[t]he insured is a wholesale distributor of aloe based health remedies" and that "[c]ustomers include medical doctors, veterinarians, [and] oncology specialists." (*Id.* Ex. 44.) It appears that, included with the premises inspection report, was a T–Up brochure entitled "Boost Your Immune System" that contains repeated references to the use of aloe products in fighting cancer and AIDS. Other promotional literature also was found in Horan Goldman's T–Up file, including a so-called "Dear Friend" letter and product instructions.[9]

The parties dispute when various items of T–Up promotional literature appeared in T–Up's file at Horan Goldman, what was forwarded by Horan Goldman to Essex, and to what extent Horan Goldman served as Essex's agent.[10] Essex asserts that the "Boost Your Immune System" brochure, "Dear Friend" letter, and instruction cards were grouped in Horan Goldman's file with the premises inspec-

tion report, indicating that they accompanied that report, and that Horan Goldman received no other T–Up materials until after Essex's policies with T–Up had been canceled. (Aff. Thomas Alfano ¶¶ 3, 5–6.) Essex further contends it never received any of these materials. (Essex's Reply to Def.'s Mot. for Summ. J. at 4.) T–Up, on the other hand, argues that its agent, Keenan, sent a copy of the "Boost Your Immune System" brochure and other promotional materials to Horan Goldman independently of the premises inspection report. (Neal Deoul's Supplemental Mem. of Law at 2.) T–Up acknowledges that it is unknown whether Horan Goldman sent to Essex the brochure and other promotional items. (Mem. of Law in Supp. of Cross–Mot. at 9.)

One thing, however, is clear: T–Up and Essex's relationship as insured and insurer ended in April of 1999, after Essex learned of a state investigation regarding T–Up's products. (Dep. Dennis Rusch at 7.) Essex had Horan Goldman send T–Up a notice stating that the policy would not be renewed because of "misrepresentation" as to the nature of T–Up's products. (*Id.*) T–Up and Hoffman, its president, subsequently were named as defendants in a lawsuit filed in federal court in Alabama.[11]

**9.** The parties have stipulated to the contents of Horan Goldman's file on T–Up. (Mem. of Law in Supp. of Cross–Mot. Ex. 52.)

The "Dear Friend" letter describes T–Up's aloe product as "the greatest single nutritional advancement in the last 100 years" and continues: "Cancer, arthritis, AIDS, chronic fatigue, M.S., herpes . . . all stem from immune deficiencies. We now appear to be able to manipulate the immune system and help the body address these and many other conditions." (*Id.*)

Also in the file are instruction cards indicating how to use the aloe vera and cesium chloride products. The directions for use of the aloe vera concentrate vary depending on whether it is being used "for general maintenance or health," "for conditions requiring

increased $T_4$ Lymphocytes," "for autoimmune conditions requiring increased $T_8$ Lymphocytes," or for "inflammatory conditions." (*Id.*) The cards list a variety of possible side effects, including diarrhea for the aloe vera concentrate and numbness of the nose, lips, and tongue for cesium chloride. (*Id.*)

**10.** Counsel for Essex conceded in oral argument on these motions that Horan Goldman was Essex's agent as to the products liability component of the policy, but not as to the premises component. This issue is addressed in Section III.B of this Memorandum.

**11.** This suit was filed by Sue Lowery and Wendy Daley, the widow and daughter, respectively, of Thomas Lowery. Hoffman and

Deoul, T–Up's vice president and secretary, was named along with T–Up and Hoffman as defendants in another lawsuit filed in state court in Virginia.[12] The plaintiffs in these cases allege that relatives suffered bodily injury and death from using T–Up products that they had been led to believe were cures for cancer.

## II.

■ Essex moves for summary judgment,[13] seeking a declaration that the policy it issued to T–Up is void *ab initio* on the ground that T–Up misrepresented the nature, use, and method of administering its products, and that this misrepresentation materially altered the risk Essex thought it was assuming in providing insurance to T–Up. (Pl.'s Mot. for Summ. J. ¶¶ 3–6.) To prevail, Essex must establish two elements, misrepresentation and materiality. *See Fitzgerald v. Franklin Life Ins. Co.*, 465 F.Supp. 527, 534–35 (D.Md. 1979), *aff'd* 634 F.2d 622 (4th Cir.1980). To show misrepresentation, Essex must demonstrate that T–Up represented that its products[14] were dietary supplements that were ingested orally, not medicinal products that could be used, among other

ways, intravenously.[15] To prove materiality, Essex must establish that it would not have provided T–Up coverage had it understood that T–Up's products were being marketed for use by those with diseases such as cancer.

■ The materiality of how the T–Up products were marketed and used is clear. In an uncontested affidavit, the Essex vice president in charge of underwriting the T–Up policy testified that Essex would not have ensured T–Up had it understood that T–Up was representing its products as possessing medicinal or pharmaceutical qualities. (Aff. Brad Dickler ¶¶ 10–12.) This is adequate to find materiality as a matter of law. *See Bryant v. Provident Life and Accident Ins. Co.*, 22 F.Supp.2d 495, 499 (D.Md.1998) (accepting as sufficient to establish materiality an uncontradicted affidavit of an insurer indicating it would not have provided disability insurance to an applicant had it known about her medical history). However, because I find that there remain disputes of material fact regarding the adequacy of T–Up's representations to Essex, I deny Essex's Motion for Summary Judgment.

T–Up have settled with the plaintiffs. *Lowery v. Hoffman,* 188 F.R.D. 651, 652 (M.D.Ala. 1999).

12. This suit was filed by Deanna Crabbe and family members in the Circuit Court of Prince William County, Virginia. (Mem. of Law in Supp. of Cross–Mot. ¶ 43.) Lawsuits by these plaintiffs against the same defendants also were filed in federal court in Virginia and state court in Maryland, but both suits have been stayed pending the outcome of the Virginia state case. (*Id.* at 10 n. 11.)

13. Jurisdiction is based on diversity of citizenship. *See* 28 U.S.C. § 1332, Compl. ¶¶ 1, 3, 7. Although the parties have not addressed choice of law, both cite Maryland case law as applicable to this dispute, and the facts support its application. Not only was the con-

tract for insurance negotiated for and signed by Defendants in Maryland, but the premiums were paid here and the insured is located here, as is the broker for the insurer. *See, e.g., Rouse Co. v. Fed'l Ins. Co.*, 991 F.Supp. 460, 464 (D.Md.1998) (listing choice of law factors in insurance case).

14. Essex refers only to the aloe vera concentrate, T–Up, in its pleadings. However, because the policy also covered the cesium chloride, and because Essex seeks to void the policy in its entirety, I treat Essex's arguments as if they refer to both products.

15. According to Defendants, a "very small percentage of the company's products were sold to doctors … for intravenous administration." (Mem. of Law in Supp. of Cross–Mot. at 17.)

Maryland law imposes a "heavy burden" on insurance applicants to correctly complete their applications. *Clemons v. Am. Cas. Co.,* 841 F.Supp. 160, 167 (D.Md. 1993), *Fitzgerald,* 465 F.Supp. at 535; *see also Sun Ins. Office, Ltd., of London v. Mallick,* 160 Md. 71, 153 A. 35, 41–42 (1931) (explaining that information solicited by questions in an insurance application "must be full and substantially true"). When an applicant makes a material misrepresentation on its application, the insurer·may be entitled to void the policy *ab initio. N. Am. Specialty Ins. Co. v. Savage,* 977 F.Supp. 725, 728 (D.Md.1997).

■ In this case, a dispute remains as to what information Essex had at its disposal before and shortly after it issued the policy to T–Up—the time in which Essex was assessing the risk it had undertaken to insure.[16] Essex claims that it decided to provide T–Up with insurance based on telephone conversations with a Horan Goldman broker and based on the Acord form, typed product labels, and T–Up's application. (Pl.'s Mem. in Supp. of Mot. for Summ. J. at 3.) Further, Essex conceded at oral argument on these motions that Horan Goldman was Essex's agent for the products liability portion of the policy. Thus, Essex concedes that information Horan Goldman obtained about T–Up which related to the products liability risk should be imputed to Essex. *See, e.g., Martin Marietta Corp. v. Gould, Inc.,* 70 F.3d 768, 771–73 (4th Cir.1995) (stating the general rule, adhered to in Maryland, that a principal is chargeable with agent's knowledge, whether or not that knowledge is communicated to the principal).

Drawing all inferences in favor of non-movant T–Up, *see Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587–88, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), it is not clear at this stage of the proceedings that T–Up misrepresented the nature of its products. The written materials provided to Essex during the underwriting process may have been incomplete and ambiguous, a matter taken up later in this Memorandum. However, T–Up argues that it provided other information to Essex or to Horan Goldman, acting as Essex's agent, that present a clear picture of the uses of T–Up products. There remains a dispute of fact over whether T–Up provided those materials to Essex at a time when Essex could have canceled or rescinded the policy, thereby avoiding liability for paying claims made against T–Up products.

Key among these other materials is an eight-page brochure T–Up produced entitled "Boost Your Immune System." This brochure clearly reveals that T–Up views its products as being useful in fighting diseases, including cancer. The brochure describes T–Up's aloe vera product as *"highly concentrated"* (emphasis in original) and "powerful," and states in the first paragraph that it "appears to be capable of increasing T lymphocytes and attacking cancer, AIDS, herpes and other viruses like nothing else before it." (Mem. of Law in Supp. of Cross–Mot. Ex. 48.) Although the brochure also discusses lesser ailments like sunburns and high cholester-

16. T–Up acknowledges that Essex could have canceled the policy if it had received materials after the policy had been issued indicating that T–Up's products posed greater or different risks than it had contracted to insure. (Mem of Law in Supp. of Cross–Mot. at 17.). *See also* Dep. William Bradley Dickler at 36 (noting that Essex could seek clarification or request cancellation of a policy if it later received information that raised a question about that policy); 2 Couch on Insurance § 31:98 (3d ed. 1997) ("If an insurer desires to rescind a contract, it is required to act with reasonable promptness after discovery of grounds for recission.").

ol, it contains numerous and repeated references to AIDS and cancer, including subheadings such as "Aloe and Cancer" and "Eliminating Liver Tumors with Aloe Vera." (*Id.*) I find that the brochure would have provided notice to Essex as to the true nature of T–Up's products. The question, however, is whether the brochure was provided in a timely fashion to Horan Goldman and thus to Essex.

T–Up contends that Horan Goldman had two copies of the "Boost Your Immune System" brochure in its files on T–Up— the one it received in approximately May 1997 in conjunction with the premises inspection report and another that Keenan sent with other promotional materials "[s]ometime following the issuance of the initial policy" as part of the products liability underwriting process. (Neal Deoul's Supplemental Mem. of Law at 1–3.) Essex counters that Horan Goldman received a "Boost Your Immune System" brochure and other promotional materials from T–Up only with the premises inspection report, and that it received nothing else revealing the nature of T–Up's products until after Essex started to learn of lawsuits against T–Up. (Letter from Scott D. Goetsch, Counsel for Essex, September 18, 2001 at 1–2,[17] Aff. Thomas Alfano ¶¶ 3–6.) As these differing accounts reveal, it is unclear if and when Horan Goldman, as part of the products liability underwriting process, obtained the "Boost Your Immune System Brochure" that would have put Essex on notice as to the nature and use of T–Up's products.[18] This dispute of material fact precludes the granting of Plaintiff's Motion for Summary Judgment.

### III.

Defendants have filed a Cross–Motion for Summary Judgment, seeking to have the Essex policy covering T–Up declared valid and in effect at the time the claims that led to the wrongful death lawsuits arose. The key issues on this motion are two-fold: first, whether Essex had enough information in its own files that it should have understood or further investigated the nature and use of T–Up's products; second, whether information that Horan Goldman obtained from the T–Up premises inspection report should be imputed to Essex, thus putting Essex on notice as to the true nature of T–Up's products. While this motion presents a close question, I will deny it.

### A.

 Maryland law imposes on insurers a duty to investigate the information provided by insurance applicants only "in extraordinary situations when the insurer is on notice that some type of investigation is necessary." *Clemons*, 841 F.Supp. at 167; *see also N. Am. Specialty*, 977 F.Supp. at 731 ("Generally, insurers ... are entitled to believe what an applicant claims to be true."). Insurers are obliged to investigate, for example, when "a considerable amount of suspicious information" is presented by the proposed insured, *Clemons*, 841 F.Supp. at 167, or when an application contains responses that "should have put the insurer on notice ...." *N. Am. Specialty*, 977 F.Supp. at 731. In this case, the items Essex had relating to T–

---

17. The letter was submitted at the court's request following the motions hearing, in an attempt to clarify the parties' positions as to these issues. Defendants' submission was Neal Deoul's Supplemental Memorandum of Law, cited previously.

18. It is not necessary to decide here whether Horan Goldman was Essex's agent as to the premises inspection report. That matter is addressed in the next section of this Memorandum.

Up's products did not trigger a duty on Essex's part to investigate T–Up further.

Essex's underwriting file on T–Up, reproduced as Plaintiff's Exhibit 4, reveals that Essex had four key items in its file on T–Up: the Acord form, the T–Up application, typewritten versions of the labels on the aloe vera and cesium chloride bottles, and photocopies of the bottles themselves. (*See also* Pl.'s Reply Mem. at 2.) The parties dispute whether Essex had a copy of the premises inspection report. *Compare* Mem. of Law in Supp. of Cross–Mot. at ¶ 39 (asserting, based on testimony of Horan Goldman official, that Horan Goldman sent the report to Essex) *with* Pl.'s Mot. for Summ. J. Ex. 4 (not including report as part of contents of Essex's underwriting file). Because this is Defendants' motion, I draw all reasonable inferences in favor of the Plaintiff and consider that the Essex underwriting file contained, at the time of underwriting and shortly thereafter, only the four items identified above.

The application and Acord form that T–Up provided to Essex do not clearly indicate that T–Up was promoting use of its products by customers who already were gravely ill. The application described T–Up's product line as "neutraceutical products (aloe vera and cesium chloride) for health." "Neutraceutical" is not defined in standard or medical dictionaries. *See generally* Merriam–Webster's Collegiate Dictionary (10th ed.1998), Webster's Third International Dictionary of the English Language Unabridged (1981), Stedman's Medical Dictionary (27th ed.2000). However, the use of this questionable term, standing alone, is not enough to trigger a duty by Essex to investigate, given the other information Essex had on T–Up. The statement in T–Up's application that the products were "for health" suggests the products were preventative in nature;

it does not imply that they were intended to be used by consumers already suffering from serious diseases, such as cancer. Similarly, the Acord form indicated that the nature of T–Up's business was "mail order distribution of ... natural substances capable of enhancing and strengthening the human immune system" and classified T–Up's business as "mail order health foods," not as pharmaceuticals.

The product labels and photocopies of the product packaging, similarly, provide no notice of the use of the products in treating cancer or other serious illnesses. The label on the aloe vera concentrate describes how the product is to be mixed with juice, but does not indicate intravenous use—a method employed by at least some T–Up consumers. The cesium chloride label recommends that consumers take "[s]ix or more capsules per day or as directed by your physician." Given the frequent admonition on product packaging about consulting a doctor, this label alone does not provide notice that the product may be used by some individuals to treat serious diseases. The photocopies of the bottles of themselves are barely legible and add nothing in terms of notice.

Viewing the evidence in the light most favorable to Essex, the non-movant on the Cross–Motion for Summary Judgment, I find that the evidence on the Acord form, application, product labels, and photocopies of product packaging was consistent with T–Up's products being health-food or dietary supplements, akin to a vitamin or herbal product that promotes general health maintenance and disease prevention. None of the documents mentioned cancer or other diseases, focusing instead only on the enhancing and strengthening health. The information was internally consistent and not so suspicious as to trigger a duty to investigate.

Defendants rely on *British & Foreign Marine Ins. Co. Ltd., of Liverpool v. Cummings*, 113 Md. 350, 76 A. 571 (1910). However, that case is distinguishable from this one. In *British & Foreign Marine*, an applicant for automobile insurance made an unintentional misrepresentation, indicating his car's model year as 1907 when in fact it was manufactured in 1906. *Id.* at 572. The court found that because the application also contained the manufacturer's number for the car, the insurer could have ascertained the correct model year by examining the manufacturer's catalogue. *Id.* at 574. In other words, the application on its face contained "inconsistent representations, which could have been discovered by the [insurer], had he carefully examined and considered the representations therein made . . . ." *Id.* Here, however, T–Up had not made inconsistent and contradictory statements on its application materials that should have alerted Essex to the true nature of T–Up's products.

Defendants also fault Essex's reliance on application forms that, they argue, were not designed to elicit material information. It is true that under Maryland law an insurance application, to justify an insurer's reliance on it, "must be reasonably designed to elicit from [the applicant] the information which he possesses, material to the risk. . . ." *Stumpf v. State Farm Mut. Auto. Ins. Co.*, 252 Md. 696, 251 A.2d 362, 367 (1969). I cannot say that either of the applications used in this case failed to meet that standard. The industry standard Acord form, while concise, provides space under its query as to "nature of business/description of operations by premise(s)" in which T–Up could have expanded on the nature of its business. (*See* Pl.'s Mot. for Summ. J. Ex. 4.) Further, in the products section, the form instructs, "Please attach literature, brochures, labels, warnings, etc." (*Id.*) By all accounts, T–Up did not attach brochures to the form. Similarly, the application requests that product brochures and other information be attached; again, T–Up did not attach anything to this document.[19] (*Id.*) T–Up cannot offer only minimal answers to the questions on the forms, fail to attach requested brochures, and then benefit from a claim that the forms did not go far enough in eliciting information.

In sum, Essex did not have information in its own underwriting file on T–Up that should have put it on notice of the nature of, or the need to further investigate, T–Up's products. Thus, Defendants are not entitled to summary judgment on this ground.

**B.**

The final question is whether Defendants are entitled to summary judgment on the ground that Horan Goldman's files contained extensive information about T–Up, including the "Boost Your Immune System" brochure, which would have put Essex on notice as to the nature of T–Up's products.[20] Defendants argue that this in-

---

**19.** Keenan testified that he asked for brochures in his initial meeting with T–Up officials, who told him the brochures were not yet available. He said T–Up sent brochures to him later, although he could not recall when. (Dep. William C. Keenan at 79–80.)

**20.** The individual who conducted the T–Up premises inspection, John "Jack" Graham of Regional Underwriters, testified that he does not remember what he attached to the T–Up

inspection report he provided to Horan Goldman; however, his report indicates that he attached one or more pamphlets and brochures. (Dep. John "Jack" Graham at 34–35.) A copy of the "Boost Your Immune System" brochure, the "Dear Friend" letter, directions for use of the T–Up products, and a refund policy card were found next to the premises report in Horan Goldman's files. (Mem. of Law in Supp. of Cross–Mot. Ex.

formation should be imputed to Essex because Horan Goldman was its agent for the premises liability portion of the policy, not just the products liability component. (Neal Deoul's Supplemental Mem. of Law at 7–8.) Essex's argument, as articulated in the motions hearing, is that the knowledge Horan Goldman gained as part of the products liability underwriting process should be imputed to Essex, but not knowledge gained in the premises inspection report.[21]

■ Maryland law imposes strict standards for deciding the existence and scope of agency on summary judgment. *See Green v. H & R Block, Inc.*, 355 Md. 488, 735 A.2d 1039, 1048 (1999), *Faya v. Almaraz*, 329 Md. 435, 620 A.2d 327, 339 (1993), *Faith v. Keefer*, 127 Md.App. 706, 736 A.2d 422, 440 (Md.Ct.Spec.App.1999), *cert. denied* 357 Md. 191, 742 A.2d 521 (1999). Defendants have not met these standards. In *Faya*, the Court of Appeals stated: "The existence of an agency relationship is a question of fact which *must* be submitted to the factfinder if any legally sufficient evidence tending to prove the agency is offered." 620 A.2d at 339 (emphasis added). The Court of Special Appeals also emphasized the role of the fact finder in *Faith*, stating that even if a movant "presented legally sufficient evidence of an agency relationship, whether an agency relationship was actually created" must be submitted to the jury. 736 A.2d at 440. Indeed, Maryland courts countenance the granting of summary judgment as to the existence of an agency relationship only when agency is the "one inference" that may be drawn from the evidence. *Green*, 735 A.2d at 1048; *cf. Globe Indem. Co. v. Victill Corp.*, 208 Md. 573, 119 A.2d 423, 429 (1956) (noting that the existence of a master-servant relationship is a question of law when there is "no conflict in the evidence relating to the question and but one inference can be drawn therefrom").

■ Maryland law considers three factors as indicative of an agency relationship: "(1) the agent is subject to the principal's control; (2) the agent has a duty to act primarily for the benefit of the principal; and (3) the agent has the power to alter the legal relations of the principal." *Kapiloff*, 155 F.3d at 498. These factors are "considerations," however, and are not determinative; the issue is instead dependent on the particular circumstances of each case. *Green*, 735 A.2d at 1049.

■ In this case, Essex had an agreement with Horan Goldman that outlined the terms of the relationship. (Dep. William Bradley Dickler at 17.) However, that document was not produced as evidence on this motion. The defendants instead proceed by attempting to establish agency by inference. They start by noting

52.) The parties have stipulated that the items appear in the file in the order relative to each other in which they were received; the Boost brochure and other items were between the May 7 report and a message dated April 17, 1997. (*Id.*)

21. In general, premises coverage is distinct from products liability insurance. *See, e.g., Lindley Chem., Inc. v. Hartford Accid. and Indem. Co.*, 71 N.C.App. 400, 322 S.E.2d 185, 188 (1984) (describing products liability coverage and premises operations coverage as "complementary," but stating that they "do not overlap and protect against two separate hazards"); *cf. Tucker Constr. Co. v. Michigan Mut. Ins. Co.*, 423 So.2d 525, 527 (Fla.Dist.Ct.App.1982) (explaining that "[l]iability insurance protection for a manufacturer arising out of the process of producing or manufacturing goods is generally termed 'premises liability' while liability protection coverage for the manufacturer once the goods are finished and moved away from the manufacturing premises is called 'products liability' "). In this case, the two types of coverage were joined under the same general commercial liability policy.

that Horan Goldman was Essex's Maryland broker. (*Id.* at 15.) However, a broker is not necessarily an agent of the insurer. A broker is "one who acts as a middleman between the insurer and insured...." *Med. Mut. Liab. Ins. Soc. of Maryland v. Mut. Fire, Marine and Inland Ins. Co.,* 37 Md.App. 706, 379 A.2d 739, 743 (Md.Ct.Spec.App.1977). Brokers generally are agents of the insured, not the insurer. *See Am. Cas. Co. of Reading, Pa. v. Ricas,* 179 Md. 627, 22 A.2d 484, 487 (1941) (noting that "[o]rdinarily, the relation between the insured and the broker is that between principal and agent"). In some cases, however, the broker is an agent of the insurer and in other cases it may be an agent of both parties at different points in the transaction. 3 Couch on Insurance § 45:3 (3d ed.1997).

Defendants also attempt to establish various links between Horan Goldman and Essex that they argue are suggestive of agency. They note that Essex pays Horan Goldman commissions and relies on Horan Goldman to gather information for it. Further, when Essex decides to insure a company and has given a firm quote as to the premium, Horan Goldman has authority to sign insurance policies on Essex's behalf. (Dep. William Bradley Dickler at 19, 24, 32–33.) None of these factors, however, necessarily proves agency conclusively. It is common within the insurance industry for a broker to serve as a conduit of information between insurer and insured and to collect commissions from an insurer; neither makes the broker the insurer's agent. 3 Couch on Insurance

§ 45:3, 7 (3d ed.1997). Finally, Horan Goldman alone does not have the power to "bind," or firmly commit, Essex on products liability policies, which would be indicative of agency, as opposed to merely signing policies on its behalf after Essex has already accepted them.[22] (Dep. William Bradley Dickler at 18.)

For the purposes of this motion, the most critical fact Defendants must demonstrate is that Horan Goldman served as Essex's agent for the premises inspection of T–Up's office. The record, however, is unclear as to the circumstances giving rise to the inspection. According to Thomas D. Alfano, Jr., of Horan Goldman, Essex required Horan Goldman to obtain an inspection of T–Up's premises. (Dep. Thomas D. Alfano, Jr., at 19–20.) William Bradley Dickler, an Essex vice president, states on the other hand that Essex "did not specifically request an inspection," although he said it is "routine that one be ordered" depending on the premium level or type of facility involved. (Dep. William Bradley Dickler at 44.) The inspections are ordered in accordance with underwriting "guidelines" that Essex has with its brokers, including Horan Goldman. (*Id.* at 48.) Those guidelines do not appear in the record compiled to support these motions.

Essex asserts that it is possible for an entity to be an agent to a principal for one purpose but not another. *See, e.g., Duckworth v. Bernstein,* 55 Md.App. 710, 466 A.2d 517, 524 (Md.Ct.Spec.App.1983) (finding individual was agent of mortgagor for purpose of attesting to consideration for

---

**22.** Essex's admission at oral argument that knowledge Horan Goldman obtained as to products liability should be imputed to it while knowledge Horan Goldman obtained as to premises liability should not be imputed thus is paradoxical, given the role Horan Goldman played in binding Essex on the two types of coverage. Dickler, the Essex vice

president, admitted in his deposition that Horan Goldman could not bind Essex as to products liability coverage, but he said Horan Goldman could bind Essex as to "certain classes of business" that include "premises, lessor [sic] hazard type of classification[s]." (Dep. William Bradley Dickler at 18.)

mortgage, but not deciding whether he was agent for purpose of negotiating loan). The Court of Appeals of Maryland case of *Green v. H & R Block* suggests, however, that there are difficulties in viewing the agency-principal relationship as one that is easily switched on and off within the same transaction.[23] In *Green*, H & R Block conceded that it was the consumer's agent for the purpose of preparing and filing tax returns, but argued that it was the bank's, not the consumer's, agent for the purposes of securing a loan for the consumer in anticipation of her tax refund. *Id.* at 1054. The court doubted that agency could be conveniently carved up within the same transaction, stating that the services could instead "reasonably be construed as a package of related services" rather than "unrelated distinct transactions." *Id.* at 1055. Similarly here, Essex's attempt to segment its relationship with Horan Goldman—stating that Horan Goldman is its agent for the products portion of the T–Up policy, but not for the premises portion—raises questions about whether the relationship could be so neatly divided. Essex offers no explanation of why agency for one purpose but not the other makes sense. At the same time, however, T–Up has not proven the extent and scope of agency such that it is clear enough to be decided as a matter of law.

The testimony by the Horan Goldman official, Alfano, that Essex required the inspection appears to support an inference that Horan Goldman acted as Essex's agent when ordering the inspection and for the purposes of processing the information gained as a result of the inspection. It does not matter that Essex did not "specifically request" Horan Goldman to obtain the inspection if the request was a standing one based on the level of premium or type of coverage provided to the insured. Although a principal "must have ultimate responsibility to control the end result of his or her agent's actions," a principal need not control every minute detail of the agent's actions. *Id.* at 1051.

Another inference, however, also may be drawn from the evidence: that in ordering the premises inspection, Horan Goldman may have been acting as an agent for T–Up. This inference would be justified if the premises inspection report were considered part of the application process—in other words, if the inspection were a requirement of coverage by Essex, much as completion of the Acord form or provision of the product labels were. As has already been explained, the provision of the application materials to Essex, by T–Up through Keenan and Horan Goldman, was not completed before the effective date of the policy. This, however, does not change their nature as application materials. As to the timing of the premises inspection, it was ordered approximately eight days before Horan Goldman received T–Up's application, Acord form, product labels, and the photocopies of T–Up's packaging, although after Essex had agreed to provide coverage. (Mem. of Law in Supp. of Cross–Mot. ¶¶ 20, 23.) This supports the inference that the inspection may have been considered part of the application process, a period in which Horan Goldman arguably was acting as an agent of T–Up, not of Essex. *See* 3 Couch on Insurance § 45:4 (3d ed. 1997) ("In the absence of special circumstances, the broker will generally be considered the agent of the insured as to matters connected with the application and procurement of insurance. . . .").

*Kapiloff*, a Fourth Circuit case dealing with just such a four-tiered arrangement

---

**23.** Although *Green* involved an income-tax preparation service that also secured loans for customers, the court likened it to an insurance brokerage firm. 735 A.2d at 1054.

of insured, insurance agent, insurance broker, and insurer, supports such an inference. In that case, which also involved Horan Goldman, the Fourth Circuit found colorable an argument that Horan Goldman was an agent or subagent of the insured, reversing a grant of summary judgment that would have dismissed the broker from the case. *Kapiloff*, 155 F.3d at 498. As here, the insureds had worked through an agent to approach Horan Goldman, who then obtained insurance for them. The court noted that Horan Goldman was engaged by the insured's agent, knew it was making an application for the insureds, and relayed information about the insureds to an insurer, applying for insurance in the insureds' names—all factors also present here. *Id.* The court also noted that if the insureds had decided to change their application or not to submit it, Horan Goldman would have been obliged to obey that request, *id.* at 498–99, a factor undoubtedly true in this case as well. Further, it explained that Horan Goldman's submission of an application to the insurer represented an offer to contract on the behalf of the insureds, thus creating the power to alter their legal relations, another similarity to this case. *Id.* at 499. It did not matter, the *Kapiloff* court said, that the insureds did not deal directly with Horan Goldman. *Id.* at 498. "What is critical is whether Horan Goldman knew of the [insureds] and acted on [their] behalf at the request of" the insureds' agent. *Id.*

*Kapiloff* illustrates the difficulty of deciding agency issues as to insurance brokers on summary judgment, when evidence of the broker's role is only circumstantial and given that insurance brokers can represent either insured, insurer, or both. Although it is far from clear that Horan Goldman was an agent or subagent of T–Up, the possibility is not foreclosed by the evidence presented

by Defendants, and such foreclosure is a necessity given the high bar Maryland law imposes before a court may decide agency on summary judgment. Because the facts on the record as it currently stands do not support only one inference—that Horan Goldman was Essex's agent for the purposes of the premises inspection—I must deny the Defendants' Cross–Motion for Summary Judgment.

A separate order effecting the rulings in this memorandum is attached.

### ORDER

For the reasons stated in the accompanying memorandum, it is, this 15th day of October 2001 ORDERED that Plaintiff's Motion for Summary Judgment and Defendant–Intervenor's Cross–Motion for Summary Judgment are denied.